Joseph H. LEVENSTEIN,
Plaintiff–Appellee,

v.

Bernard SALAFSKY, Patricia A. Gill, and David C. Broski, in their individual capacities, Defendants–Appellants.

No. 97–1902.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1997.

Decided Dec. 16, 1998.

Richard R. Winter, Sarah E. Pace (argued), McBride, Baker & Coles, Chicago, IL, for Plaintiff–Appellee.

D. Scott Watson, Keck, Mahin & Cate, Chicago, IL, Carla J. Rozycki (argued), Jenner & Block, Chicago, IL, for Defendants–Appellants.

Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Although it is often possible to resolve a public official's claim of qualified immunity as a matter of law, by taking the facts in the light most favorable to the party opposing that claim, in a small number of cases the existence of disputed facts requires further proceedings in the district court. Confronted with such a case, a district judge naturally denies the official's motion to dismiss, or motion for summary judgment, based upon qualified immunity. That action sets up an odd problem for appellate review: if a district court *denies* qualified immunity because the record shows disputed issues of fact, the Supreme Court has ruled that the order is not immediately appealable. *Johnson v. Jones*, 515 U.S. 304, 307, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). If, on the other hand, the denial of qualified immunity rests entirely on legal conclusions, then the Court not only permits an immediate appeal but actually encourages one, because of the importance of protecting the public official both from the trial process and from liability. See, *e.g., Crawford–El v. Britton*, 523 U.S. 574, ——— ———, ——— n. 19, 118 S.Ct. 1584, 1592–93, 1597 n. 19, 140 L.Ed.2d 759 (1998); *Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 525–28, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

In the case before us, Dr. Joseph Levenstein sued three officials of the University of Illinois ("the University defendants"), claiming that they violated his constitutional rights by improperly suspending him, denying him a fair hearing, and forcing him to resign from the University because of allegations that he had committed acts of sexual harassment. The University defendants re-

sponded with a motion to dismiss the First Amended Complaint under Fed.R.Civ.P. 12(b)(1), (2), and (6), arguing in part that they were entitled to qualified immunity. The district court, adopting the recommendation of the magistrate judge, denied the motion in its entirety, thereby allowing the case to proceed. The defendants then appealed from the portion of the order rejecting their qualified immunity defense. Because this appeal comes to us from a motion under Rule 12(b)(6), we do not face the kind of problem that defeated appellate jurisdiction in *Johnson v. Jones, supra*. Unlike a motion for summary judgment, which raises in part the question whether the opposing party has demonstrated the existence of disputed facts, a motion to dismiss for failure to state a claim raises only legal issues. This is because a Rule 12(b)(6) motion requires the court to accept as true all well-pleaded facts in the complaint, drawing all reasonable inferences in favor of the opposing party. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996); see also *Williams v. Alabama State Univ.*, 102 F.3d 1179, 1182 n. 4 (11th Cir.1997) (*Johnson* does not apply to motions to dismiss, which raise purely legal issues). Under *Mitchell* and *Behrens*, we have appellate jurisdiction over an interlocutory appeal from a denial of qualified immunity when no factual issues need to be resolved. See *Behrens*, 516 U.S. at 308, 116 S.Ct. 834; *Mitchell*, 472 U.S. at 526–27, 105 S.Ct. 2806. We therefore proceed to the merits of the appeal.

## I

■ Before we recount the relevant facts we must clarify what is properly before us and what is not. Levenstein attached numerous documents to his complaint, which under Fed.R.Civ.P. 10(c) are considered part of his complaint. The defendants complicated matters, though, by attaching a raft of other documents to their motion to dismiss. Under Rule 12(b), when this happens the court must either convert the 12(b)(6) motion into a motion for summary judgment under Rule 56 and proceed in accordance with the latter rule, or exclude the documents attached to the motion to dismiss and continue under Rule 12. The defendants argued to the district court that their documents were somehow exempt from this rule and relevant to the motion to dismiss; Levenstein disagreed. (This spat is typical of the skirmishes these parties have had on countless issues in the case; motions for sanctions have flown back and forth with abandon. We regret that the parties did not pay more attention to the Standards of Professional Conduct within the Seventh Federal Judicial Circuit, adopted Dec. 14, 1992.) We agree with Levenstein; the defendants filed a motion to dismiss, not a motion for summary judgment. While "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are *central* to his claim," *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir.1994) (citations omitted) (emphasis added), this is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment, and the defendants' perfunctory arguments for the centrality of these documents are unpersuasive. We, like the district court, therefore do not take these documents into account in our review of this case. This also disposes of Levenstein's motion to strike the defendants' principal and reply briefs because of their reliance on the improper materials. We deny the motion to strike as unnecessary.

■ The district court, noting that Levenstein wanted further discovery, chose to handle the case as a straightforward motion to dismiss, rather than converting it to a motion under Rule 56. It was within its discretion to do so. *Cf. Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). First, as the defendants are plainly aware, motions for judgment based on qualified immunity should be decided as early as possible, and thus when such a motion might be granted without discovery the district court is well within its discretion to address it. *Cf. Crawford–El*, 523 U.S. at ——, 118 S.Ct. at 1593. In exceptional cases the defendants may take a second appeal from a district court's refusal at a later stage to dismiss the action on the

ground of qualified immunity. *Behrens*, 516 U.S. at 308, 116 S.Ct. 834.

■ Finally, we note with perplexity that the complaint in this case seems to be covered under a protective order issued by the district court. The parties inexplicably have failed to include that order in the record on appeal, and in any event we can see no reason on the face of the appellate record why the complaint itself was so protected. Litigation is a public exercise; it consumes public resources. It follows that in all but the most extraordinary cases—perhaps those involving weighty matters of national security—complaints must be public. In any event, given that the briefs on appeal are (appropriately) publicly available documents, and the briefs recount all allegations contained in the complaint, we present the facts as alleged in the complaint.

## II

Levenstein was born and raised in South Africa, where he practiced medicine from 1969 until 1990. He was affiliated with the University of Capetown for that entire time, and was the head of its Unit of General Practice, Department of Community Health, from 1978 to 1990. With numerous publications to his name and visiting positions at 14 universities in four different countries, he earned an international reputation over the years. This attracted the attention of the University of Illinois, which recruited him in 1990 to join the medical school in Rockford as a tenure track professor and head of the Department of Family and Community Medicine. After a short time, the University named him executive head of the Family and Community Medicine Departments for all four University campuses. The University awarded him tenure in 1992, and he received other awards in 1994.

In early 1995, Levenstein became suspicious about certain unexplained financial losses at the medical school, which he described in his complaint. In April 1995, he formally requested a detailed accounting to explain a $504,000 charge against his department and the "Medical Service Plan" for unnamed expenses; he also requested general budgetary information about the medical school. The

University never furnished this information. Levenstein also had reservations about the University's use of certain state funds, which he thought were being misspent. Even though Levenstein brought these concerns to defendant Dean Bernard Salafsky's attention, Salafsky took no action. On April 11, 1995, Ray Carlson, Levenstein's "Special Projects Director," met with a representative of the University's business administration office, who allegedly criticized Levenstein's inquiries.

Two days later, on April 13, defendant Patricia Gill, the deputy associate chancellor for the University of Illinois Affirmative Action Program in Chicago ("the AAP"), received an anonymous letter from a medical student complaining that Levenstein had sexually harassed her. Gill informed Levenstein, Salafsky, and Executive Dean Gerald Moss about the complaint, but she told Levenstein that no investigation would be opened because the complaint was anonymous.

In the meantime, Levenstein continued to pursue his inquiries about possible financial irregularities. He met with Salafsky and Dr. Donald Wortmann, the associate dean of Education, on May 11. At that meeting, according to Levenstein's allegations, Salafsky and Wortmann tried to persuade him to resign, and they ominously referred to a former associate dean of the College of Medicine who had been demoted under a cloud of sexual harassment allegations. Salafsky told Levenstein that if he did not resign he would be suspended with pay effective 5:00 p.m. that day. Levenstein refused, and Salafsky then issued a letter suspending him effective 5:00 p.m., prohibiting him from entering University facilities during his suspension, and telling him to contact Gill should he have any questions. According to Levenstein, this procedure did not comply with the rules for suspending a tenured professor contained in the contract governing his employment with the University. Those rules stipulate that only the president could order such a suspension, and only "under exceptional circumstances, and when such action is clearly necessary and justified." The complaint alleges that the University defendants admitted that

the president was not involved in the decision to suspend Levenstein.

One hour before his suspension was scheduled to begin, Levenstein contacted Gill for further information. She told him that she had discussed the situation with Salafsky, and suggested that Levenstein could avoid an official investigation if he resigned by Monday, May 15, 1995. The pressure mounted when Salafsky called an emergency meeting of the faculty the next day, May 12, to address Levenstein's suspension. At the meeting, Salafsky publicly stated that he had repeatedly warned Levenstein about his five-year pattern of sexually harassing behavior. Salafsky also alleged that he had decided to investigate these charges after Gill received letters during the preceding month from "at least four" women claiming that Levenstein had committed acts of verbal or physical abuse (or both). Levenstein alleges that his file contained no record of complaints about or warnings derived from a five-year pattern of harassment, and that Gill and Salafsky had only the one anonymous letter at the time they acted.

The University defendants continued to take a variety of actions designed to force Levenstein out over the next several months, including notifying the hospitals where he practiced that it would not provide back-up coverage, which prompted them to suspend Levenstein's privileges, and withdrawing his university-supplied malpractice insurance. (Levenstein alleges these actions were unnecessary since he was contractually prohibited from competing with the University by working at these hospitals while suspended.) Salafsky and Gill also recruited additional complainants against Levenstein, and Salafsky began planning for his replacement. Gill began spreading rumors that Levenstein had a history of inappropriate behavior, and she falsely told members of Levenstein's staff that students had complained about him in the past in an effort to convince staff members to file complaints against Levenstein. Two did, and in May the formerly anonymous student came forward under pressure from the administration. Gill suggested that the various complainants compare notes, which they did. After receiving written complaints from these three women, Gill edited and rewrote those complaints to transform them from generalized complaints about Levenstein's character to specific, and more sinister, allegations of sexual harassment. The complainants asked that Levenstein be removed from supervisory roles. In the meantime, Levenstein continued unsuccessfully to try to look into the financial issues. His assistant involved in these investigations was fired, and Levenstein claims that certain files relating to the investigations disappeared from his office. Salafsky at this point assigned fiscal control of Levenstein's department to himself, so that (according to Levenstein) he could "subvert state and federal grant monies." During this period, 13 faculty members in Levenstein's department were allegedly fired, given terminal contracts, or felt compelled to resign in protest of Levenstein's treatment.

Gill's investigation continued. The complaint alleges that she refused to interview the people Levenstein asked her to contact, she went to great lengths to solicit negative information, and she twisted the information she did obtain from witnesses. After taking longer than allowed by University policy to complete the investigation, the University's AAP office eventually concluded that Levenstein had violated the University's policy against sexual harassment. It advised Deans Moss and Salafsky to allow him to return to the classroom and to treating patients, but to prohibit him from holding any supervisory role over women for a period of three years. The recommendation was expressly contingent on the University's deciding that he could work as a member of the faculty without being in a supervisory role; if that was not possible, the AAP recommended his dismissal. Salafsky never responded to the recommendations, as he was required to do by University policy. Levenstein appealed to defendant Chancellor David C. Broski. Again, however, the University's rules were breached in multiple ways. The Sexual Harassment Procedures specified that the Chancellor was to choose appeal panel members, but instead, Levenstein alleged, he allowed Gill to hand-pick the committee. Also in violation of University policy Levenstein was not allowed to be heard or to present

witnesses to this panel, although he was invited to, and did, submit his reasons for the appeal on August 22. At the same time, he filed an action against the University and Dean Salafsky in the Illinois Court of Claims, alleging breach of contract and tortious interference with business relationships. (As far as the record shows, to date there has been no judgment in the state court case; we therefore do not need to explore any questions about claim preclusion.) Gill was allegedly involved in distributing Levenstein's submitted statement to the appeals panel and repeatedly discussed the case with the panel. After a delay longer than allowed under University policy, the panel ultimately found Levenstein guilty on all charges, and, despite privately concluding that Levenstein's suspension should be lifted, left the question of the appropriate sanction up to Broski.

About a month after receiving the panel's report, Broski removed Levenstein from his position as department head and recommended to President Stukel that Levenstein be dismissed. On January 9, 1996, Stukel wrote to Levenstein and promised to "view this matter most seriously." These words proved empty. Stukel instead did nothing for a month, and then he wrote on February 7 to inform Levenstein that he was being reassigned pending consultation with the Faculty Advisory Committee (FAC) about whether cause existed for his dismissal. The reassignment proved to be demeaning makework, a job reviewing old medical training videotapes at his home. Levenstein appeared before the FAC a month later, which, like the prior appellate panel, had been briefed by Gill, with only damning material provided. The FAC limited his hearing to one hour, refused to read material he had brought, and refused to allow his attorney to address the committee. It, too, then sat on its hands. When, six weeks after the hearing, the FAC had still done nothing, Levenstein resigned from the University in despair.

At its core, Levenstein's suit alleges that the procedures the University defendants used in essentially forcing him out were a blatant sham—the equivalent of no procedures at all. Most or all of them plainly violated internal University rules. For example, he alleges that only the president had the authority initially to suspend a tenured faculty member, but the dean purported to take that action in his case. Similarly, the University's procedures require that a tenured faculty member receive a formal hearing within 60 days of a suspension, whereas in his case things were dragging on indefinitely, and he was forced to perform pointless work and live with a cloud on his reputation. And, he alleges, the decisionmakers themselves were tainted, all convinced in advance of his guilt. As Levenstein has pleaded this case, the question is whether state university officials have qualified immunity from a claim that alleges a deprivation of constitutional rights in these circumstances. His complaint claims of a violation of 42 U.S.C. § 1983, through a violation of his right to procedural due process, for deprivation of his property interest in his job without adequate procedures, and a violation of his right to equal protection, because the University defendants used arbitrary disciplinary procedures that were enforced against him differently from the way they were applied to others based on his exercise of protected constitutional rights.

### III

Public officials are entitled to qualified immunity from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crawford–El*, 523 U.S. at ——, 118 S.Ct. at 1592, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). See also *Behrens*, 516 U.S. at 305, 116 S.Ct. 834. As we stated in *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996):

[t]he inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It is an objective test, as the Supreme Court recently reiterated, "precisely in order to permit the defeat of insubstantial claims without resort to trial."

*Behrens*, 516 U.S. at 306, 116 S.Ct. 834 (internal quotations omitted).

As *Erwin* also made clear, once the public official raises the defense of qualified immunity, the plaintiff bears the burden of showing (1) whether he or she has asserted a violation of a constitutional right, and (2) whether the applicable constitutional standards were clearly established at the time in question. *Erwin*, 92 F.3d at 525; see also *Khuans v. School Dist. 110*, 123 F.3d 1010, 1013 (7th Cir.1997); *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1173–74 (7th Cir.1997). In the present case, the question is whether Levenstein has successfully alleged a violation of one or more constitutional rights, and if so, whether he has shown that the constitutional standards were objectively clear at the time the University defendants took their action. It is also important to address the latter question at the proper level of specificity. See *Anderson*, 483 U.S. at 639–40, 107 S.Ct. 3034 ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Public officials should not need to have the insight of constitutional law scholars, or the hindsight of Monday morning quarterbacks, to succeed in a qualified immunity defense. *Cf. Crawford–El*, 523 U.S. at ——, 118 S.Ct. at 1593.

■ Looking first at Levenstein's procedural due process claim, we begin with the easy questions. It is undisputed that, as a tenured faculty member, he had a property interest in his job. *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir.1995); *Fumarolo v. Chicago Bd. of Educ.*, 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283, 1306–07 (Ill.1990); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). He has attempted to argue on appeal that he was also deprived of a liberty interest in his good name, but that claim was not before the district court in the First Amended Complaint, and we therefore do not rely on it. Second, Levenstein is *not* arguing that the initial act of suspending him with pay violated any constitutional right, and he is

wise not to do so in light of *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), and *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also *Ibarra v. Martin*, 143 F.3d 286 (7th Cir.1998). Instead, he is arguing that the combination of the sham process the University defendants followed and his extensive suspension amounted to a constructive discharge, and that the University defendants never gave him an adequate opportunity to respond to that action. This is very similar to the claim we recognized in *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir.1984), *cert. dismissed*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985), in which this court held that a person could be effectively deprived of a property interest in a job by being relegated to the basement with no work to do. The University defendant's decision to forbid Levenstein from seeing patients for over 11 months and to eventually assign him to the task of reviewing old medical training videos are, for a physician whose reputation spanned several continents, the equivalent.

■ Levenstein has therefore adequately alleged a constructive discharge, and his allegations that the procedures used were inadequate and biased were also enough to survive a motion to dismiss. Levenstein had notice of the charges and understood the evidence against him, but when the procedures used to investigate the charges are a sham through and through, there has not been a constitutionally sufficient opportunity to respond. See *Doe v. Board of Educ. of Oak Park & River Forest High School Dist. 200*, 115 F.3d 1273, 1283 (7th Cir.1997); *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir.1982) ("Due process requires that a hearing 'must be a real one, not a sham or a pretense.'") (quoting *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoting *Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). This is not, of course, because the Constitution requires the University to follow the letter of its own procedures, but because Levenstein is entitled to constitutionally sufficient procedures before he can be deprived

of a protected property interest and he asserts that the University did not furnish them.

That takes us to the second part of the immunity inquiry: whether the applicable constitutional standards were clearly established at the time in question. Accepting the facts presented in Levenstein's complaint, and the inferences fairly drawn from those facts, we must at this stage resolve that question in Levenstein's favor as well. The pertinent constitutional standards are long-standing, and include those establishing Levenstein's property right in the job, which has been clear at least since *Slochower v. Board of Higher Education of City of New York*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); those establishing the right to adequate notice and an opportunity to be heard before that job can be taken away, see *Roth*, 408 U.S. at 573 & n. 12, 92 S.Ct. 2701; see also *Loudermill*, 470 U.S. at 542–45, 105 S.Ct. 1487; and those clarifying the commonsense notion that fundamentally biased process is not *due* process. *E.g. Palko, supra*, 302 U.S. at 327, 58 S.Ct. 149; *Fay v. New York*, 332 U.S. 261, 288, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); *Kwock Jan Fat v. White*, 253 U.S. 454, 457, 40 S.Ct. 566, 64 L.Ed. 1010 (1920); *Ciechon*, 686 F.2d at 517. University officials knew that they could not offer only a phony opportunity to contest charges. In their briefs they dispute this characterization of their actions as a matter of fact, but this is not the time for either them or us to engage in that debate. At this stage, therefore, Levenstein has alleged enough to survive dismissal of his procedural due process claims on qualified immunity grounds.

Levenstein's equal protection claim, while it strikes us as more tenuous, at this early stage also adequately alleges a constitutional violation for purposes of resisting the immunity defense. Selective prosecution violates the equal protection clause "where the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir.1995). It is also actionable "where the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him." *Id.* See also *Olech v. Village of Willowbrook*, 160 F.3d 386, 387 (7th Cir., Nov.12, 1998). As we explained in *Indiana State Teachers Ass'n v. Board of School Commissioners*, 101 F.3d 1179, 1181 (7th Cir.1996), where people identical in relevant ways are treated differently, the disadvantaged person can state an equal protection claim. See also *Ciechon*, 686 F.2d at 522–23.

Although the University defendants have tried to resist Levenstein's claim by pointing out that he has not identified anyone else who was treated better, since no other department head had ever been accused of sexual harassment by multiple people, this proves too much. First, according to the complaint, whose allegations we must take to be true, there was only one complaint against Levenstein at the time of his suspension, it was anonymous, and University officials said that it was not enough to trigger an investigation. Notwithstanding that representation, they vindictively went ahead and investigated Levenstein anyway, setting in motion the chain of events that led to his constructive discharge. Second, at this stage of litigation Levenstein is not obliged to gather the kind of factual support the University defendants believe is lacking. The allegations of his complaint would permit him to gather evidence about the way the University has treated other supervisory employees, other department heads, or possibly other tenured faculty. (Levenstein argues that the appropriate comparison group is tenured faculty members—who are all covered under the same contract—a factual dispute we are not able to resolve at this point in the litigation.) If the preponderance of the evidence eventually supports his claim, then he will meet the requirements of the equal protection theory. See *Esmail*, 53 F.3d at 179. Finally, Levenstein has alleged malice and a motive to retaliate against him personally because of his belief that certain financial transactions needed to be reviewed and that

his superiors might be covering up financial irregularities. That is enough to put his case squarely into the pattern we recognized in *Esmail*. See also *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) ("[T]he decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.") (citations omitted).

Once again, taking Levenstein's allegations to be true, we find that the relevant constitutional standards were well established at the time the University defendants acted. So-called "class of one" equal protection claims, cases "in which a governmental body treated individuals differently who were identically situated in all respects rationally related to the government's mission," *Indiana State Teachers Ass'n*, 101 F.3d at 1181, have been allowed in this circuit since at least *Ciechon*. While such claims have rarely been successful once the relevant factual record has been developed, see *Esmail*, 53 F.3d at 179 ("the holding [of *Ciechon*] ... has rarely brought ultimate victory to a plaintiff"), that is irrelevant to our review of the facts as alleged in Levenstein's complaint. Levenstein's allegation that his suspension, public humiliation, and constructive discharge were caused not by allegations that he had committed acts of sexual harassment, but rather arose from the sheer vindictiveness the University officials felt toward him as a result of his decision to investigate possible financial mismanagement in programs at the University for which he bore some responsibility, falls within the context of selective prosecutions prohibited by the Equal Protection clause. *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524; *Ciechon*, 626 F.2d at 523 n. 16; *Esmail*, 53 F.3d at 179.

## IV

It is plain from reading the briefs, the motions, and the accusations in this case that the facts are hotly contested. If one believes Levenstein, an honorable physician was virtually framed by the University defendants, just so that they could avoid the embarrassment of a close inspection of the way they managed various grants and other funds. If one believes the University defendants, they were trying to deal with a department head who had a long history of abusing his position in ways that amounted to sexual harassment; they gave him many opportunities to justify his action; and he chose to walk out the door before the internal University procedures could run their course. We take no position on which of these accounts, if either, represents the "truth" of the matter. That remains to be seen, in whatever further proceedings are appropriate in the district court. We decide today only that, for purposes of the motion for failure to state a claim, the district court properly denied the University defendants' claim of qualified immunity, and we AFFIRM the judgment of that court.