In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3889

Michael Pitts and Charles Lawson,

Plaintiffs-Appellants,

v.

City of Kankakee, Illinois, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 C 2281--Michael P. McCuskey, Judge.

Argued March 7, 2001--Decided September 24, 2001

Before Diane P. Wood, Evans, and Williams,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Like the
plaintiff in Albiero v. City of Kankakee,
246 F.3d 927 (7th Cir. 2001), Michael
Pitts and Charles Lawson brought a suit
under the federal civil rights statute,
42 U.S.C. sec. 1983, challenging the City
of Kankakee's placement of "slum" signs
on certain properties. There, however,
the similarity between these two cases
ends. In Albiero, this court considered
the merits of an equal protection
challenge to the City's actions labeling
the plaintiff a "slum lord," and affirmed
a judgment for the City. Here the
question is procedural: did these
plaintiffs sue too late? The magistrate
judge, and then the district court,
concluded that the complaint was time-
barred. We agree with this assessment and
therefore affirm the district court's
judgment dismissing the claims.

I

   According to the complaint, whose
allegations we accept for present
purposes, see Kennedy v. Nat'l Juvenile
Detention Ass'n, 187 F.3d 690, 694 (7th
Cir. 1999), plaintiffs Pitts and Lawson
publicly supported and campaigned for the
opponent of Kankakee Mayor Donald E.
Green in the elections held in 1993 and

1997. Pitts and Lawson are officers in the Kankakee Landlords Association, or KLA. Beginning in 1994, they also publicly opposed various city policies relating to landlord licensing. During the 1997 mayoral campaign, the KLA invited candidates to participate in a public forum. Mayor Green did not wish to participate, but Corporation Counsel Christopher Bohlen asked if he could speak on the Mayor's behalf. The KLA refused, and thereafter Mayor Green and Bohlen developed a plan to retaliate against Pitts and Lawson by embarrassing them.

The retaliation took the form of strict enforcement of the City's codes. First, in January 1997, Pitts received a notice from the City stating that the owner of the property located at 319 South Albert had 180 days in which to correct specified violations of the City's building code. The City sent this notice to Pitts even though it was aware that Pitts did not own the property. After receiving the notice, Pitts, on behalf of the actual owner, made the required repairs. Despite the completion of the repairs, on June 11, 1997, the City placed a sign on the property identifying Pitts as the owner, listing his business address and telephone number, labeling the address "SLUM PROPERTY," and declaring that "the owner is in violation of city code and chooses not to bring the property into compliance thereby significantly contributing to the blight in this neighborhood." On June 13, 1997, the City placed a similar sign on rental property owned by Lawson. Finally, on June 30, 1997, the City placed another sign on property located at 921 East Merchant, once again erroneously identifying Pitts as the owner.

On August 16, 1999, the Kankakee City Council ordered the removal of the sign located on the 319 South Albert property. The defendants, however, did nothing, and the sign stayed there until April 7, 2000. (It is unclear whether they finally removed it on the latter date or if it disappeared in some other way.) On October 27, 1999, Lawson sold his property to Neighborhood Partners of Kankakee, Inc., which made its purchase with the help of a loan from the City. Despite this sale and its own participation in the transaction, the

City did not remove the slum sign identifying Lawson as the owner until December 3, 1999.

On November 18, 1999, Pitts and Lawson brought suit alleging that the City, Mayor Green, and Corporation Counsel Bohlen had violated their First Amendment rights by placing and maintaining the "SLUM PROPERTY" signs on the three properties in retaliation for the plaintiffs' political opposition. Later, on April 27, 2000, they filed an amended complaint. The defendants filed a motion to dismiss the amended complaint, which was referred to Magistrate Judge Bernthal. He prepared a report for the district court that recommended granting the defendants' motion on the ground that the case was barred by Illinois's two-year statute of limitations, which applies to sec. 1983 cases. The signs were all posted in June 1997, yet the plaintiffs waited approximately 29 months to file their action. The plaintiffs responded that this was a "continuing violation," and thus allowed them to file within two years of the last date when the signs were posted. That would have given them until April 7, 2002, for the South Albert property and December 3, 2001, for Lawson's property--dates that their November 1999 complaint easily satisfied; no date was specified for the removal of the sign on the Merchant property, although one allegation might permit the inference that April 7, 2000, was also the time when it was removed. The magistrate judge was not persuaded that this fit within the continuing violation doctrine; he saw the continuing presence of the signs as a lingering effect of the previous violation. The district court agreed and dismissed the complaint.

II

As the district court recognized, the fate of this case turns on whether the plaintiffs have brought their suit in time. Their first effort to convince us that they have done so rests on the continuing violation concept. The continuing violation doctrine is, as we noted in Heard v. Sheahan, 253 F.3d 316 (7th Cir. 2001), best characterized as a doctrine governing the accrual of a claim. Id. at 319. Normally, the statute begins to run from the date of an injury,

but in several situations that rule does not apply. One is when it "would be unreasonable to expect the plaintiff to perceive offensive conduct," or when the earlier violation may be recognizable as actionable only in light of later events. See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999). In other instances, illustrated well by the Supreme Court's decision in Bazemore v. Friday, 478 U.S. 385 (1986), each day or week brings a fresh wrong. In Bazemore, for purposes of a Title VII wage discrimination claim, the Court endorsed Justice Brennan's statement that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII,regardless of the fact that this pattern was begun prior to the effective date of Title VII." Id. at 395-96. To similar effect is a district court case on which the plaintiffs rely, Gonzalez v. N. Township of Lake County, 800 F. Supp. 676 (N.D. Ind. 1992), reversed on grounds unrelated to the statute of limitations, 4 F.3d 1412 (7th Cir. 1993). There the plaintiffs wanted to challenge the maintenance of a religious monument that had been erected 27 years before the complaint was filed. The district court decided that the case was not time-barred, because the claim accrued every day the monument remained on display. It dismissed on other grounds, but this court reversed, upheld the plaintiffs' standing, and found that the display violated the Establishment Clause. See Gonzalez, 4 F.3d at 1422.

Drawing the line between something that amounts to a "fresh act" each day and something that is merely a lingering effect of an earlier, distinct, violation is not always easy. (Indeed, this area is so confused that the Supreme Court recently granted certiorari in Morgan v. National Railroad Passenger Corp., 232 F.3d 1008 (9th Cir. 2000), cert. granted, 121 S. Ct. 2547 (2001) (No. 00-1614), which involves precisely this point. Our task at present, however, is to apply the law as it now stands to the best of our ability.) In this case we think that the district court was correct to characterize the Pitts/Lawson complaint as merely a lingering effect of an earlier violation. The point of Bazemore was that as long as the discriminatory paychecks keep coming, it is still

possible to implement a remedy that eradicates that discrimination, though the Court noted as well that recovery might not be permitted for pre-1972 acts of discrimination. 478 U.S. at 395. Here, in contrast, the City took only one action for each parcel of land, and each action affected only one person: on particular dates, it posted "SLUM PROPERTY" signs. As of that moment, the plaintiffs knew they had suffered an injury; and nothing new happened thereafter to change the nature of the injury, save for a kind of continuing defamation that we discuss below.

The Gonzalez situation comes closer to this case, but in the final analysis we consider it distinguishable as well. The First Amendment's command that there be no establishment of religion stands on a different footing from a private individual's interest in avoiding defamation. All citizens have an interest in preventing government from sponsoring one particular religion, however worthy the tenets of that faith may be. Indeed, it might not be too much to say that an important part of the reason why the United States has been fortunate enough to escape most of the religious conflict that has plagued other parts of the world is that the Constitution itself demands that the government maintain a position of absolute neutrality among religions. Potential violations of this principle may not be obvious, however, to those who share a common background. In a predominantly Christian community, it may take a Buddhist, or a Moslem, or a Jew, or an atheist, to call to the authorities' attention a possible violation of the Establishment Clause. The rights of such citizens do not expire simply because a monument has been comfortably unchallenged for twenty years, or fifty years, or a hundred years. Each day, as our own opinion in Gonzalez implicitly recognized, brings a new duty on the government's part, and a corresponding new right to seek vindication of the constitutional right in question.

The complaint Pitts and Lawson wish to raise is significantly different. At bottom, they wish to say that the City is defaming them by identifying them as owners of slum property, and that it is doing so at Mayor Green and Corporation

Counsel Bohlen's instigation to retaliate against them for their political views. The City published its insulting accusations in each case with a single sign, put up on one day and left undisturbed for a period of time. Defamation alone, of course, is not something that is ordinarily cognizable under sec. 1983, see Paul v. Davis, 424 U.S. 693 (1976), but here we have a claim of defamation as a method of retaliation for the exercise of First Amendment rights. But this simply rephrases the question: did the alleged retaliatory acts all occur in June 1997, or did they continue each day the signs were on the properties? The question when a sec. 1983 claim accrued is a characterization issue that is governed by federal law. See Wilson v. Garcia, 471 U.S. 261, 270 (1985).

We think that the best analogy here, for purposes of deciding when this claim accrued, is to cases in which a single publication defames a person, often over a period of time as copies of that newspaper, or book, or other material, circulate around a community. These kind of claims fall under what is known as the "single publication rule," recognized both in the Uniform Single Publication Act promulgated by the National Conference of Commissioners on Uniform State Law, and in the Restatement (2d) of Torts sec. 577A (1977). As it happens (though this is not dispositive since we are dealing with a federal law issue), Illinois has enacted the Uniform Act. See 740 ILCS 165/1. That statute provides that a cause of action for libel is complete at the time of first publication, and any subsequent appearances or distributions of copies of the original publication do not toll the statute of limitations. See, e.g., Founding Church of Scientology of Washington, D.C. v. American Medical Ass'n, 377 N.E.2d 158, 160-61 (Ill. App. 1978). Compare also Bryson v. News America Publications, Inc., 672 N.E.2d 1207, 1222 (Ill. 1996) (holding that a cause of action for defamation accrues on the date the defamatory material is published to a third party). The signs on the three pieces of property at issue here are very much like a statement in a newspaper or on a billboard. For precisely the same reasons that the Restatement (2d) of Torts sec. 577A

highlights, which relate to the need to prevent a multiplicity of lawsuits, we conclude that the single publication theory should apply to the present situation. The retaliatory acts that form the basis of the complaint Pitts and Lawson filed were complete in 1997. Only their effects lingered on until the signs were removed.

The plaintiffs also argue that the defendants' deliberate refusal to take down the offending signs was a fresh violation that makes this lawsuit timely. But this argument runs up against the principle, by now well established, that the refusal to undo a violation is not a "fresh act" of discrimination (or here, retaliation), but instead is a persisting effect of past discrimination that does not affect the running of the statute of limitations. See Sharp v. United Airlines, Inc., 236 F.3d 368, 373 (7th Cir. 2001); see also Christiansen v. APV Crepaco, Inc., 178 F.3d 910, 916 (7th Cir. 1999) (union's continuous failure to file a grievance is not a continuing violation).

It is undisputed that Pitts and Lawson did not file their lawsuit until November 1999, some 29 months after the three signs were posted, and thus 5 months beyond the two years permitted for actions under sec. 1983 in Illinois. We therefore Affirm the judgment of the district court dismissing their claims as time-barred.