In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 01-2797 and 01-3631

J. ROBERT TIERNEY, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CHET W. VAHLE and DEBBIE OLSON,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 99 C 3149—**Jeanne E. Scott,** *Judge.*

ARGUED APRIL 18, 2002—DECIDED SEPTEMBER 18, 2002

Before FLAUM, *Chief Judge,* and HARLINGTON WOOD, JR.,
and POSNER, *Circuit Judges.*

POSNER, *Circuit Judge.* The Tierneys and two of their four
children brought this wide-ranging civil-rights suit (42
U.S.C. § 1983) against 19 individuals and two institu-
tions—the public school district of Quincy, Illinois, and
a private swimming club in Quincy—charging retaliation
and conspiracy to retaliate against the family for the exer-
cise by Mr. and Mrs. Tierney of their right of free speech.
The district court granted motions by the defendants
Debbie and Doug Olson and Chet Vahle to dismiss the
complaint against them for failure to state a claim and

also ordered the plaintiffs to pay some $2,400 to Debbie Olson to reimburse her for the attorneys' fees that she incurred in defending against what the judge ruled was a frivolous claim. The judge made the dismissals and the sanction order final judgments under Fed. R. Civ. P. 54(b), enabling an immediate appeal by the plaintiffs. They challenge the dismissal of Vahle as a defendant (but not the dismissal of the Olsons) and the award of attorneys' fees.

The complaint alleges the following facts. Defendant Richard Powers, an employee of the swimming club (to which the Tierneys belonged), was also the head coach of the Quincy High School swim team and used the swimming club's pool for team training. Powers kissed one of the girls on the team, "appeared at a gathering of the swim team at a swimmer's home and required the girls to lay [sic] on a pool table in the basement of the home in order to receive . . . so-called 'massages' " and in the course of this "placed his hands on the legs and thighs of Plaintiff, Meryl Tierney, up to her buttocks. He further required her to unhook the straps of her bra in order to allow him to place his hands on her bare back." The complaint alleges that he did similar things to other girls at the party. (We emphasize that these are just allegations; they may for all we know be false.) Mr. and Mrs. Tierney complained to the school district. An assistant superintendent, defendant Schildt, interviewed the girls and prepared a confidential report on the incident. He showed the report to the school district's lawyer, defendant Gorman, who in turn showed it to defendant Vahle, a juvenile-court judge; in addition the members of the board of the swimming club, who are also defendants, were told about the report.

Judge Vahle wrote a letter—the centerpiece of the Tierneys' case—on judicial stationery to the high school

athletic director, which is to say Coach Powers's immediate superior. The letter reads as follows:

I write to offer my views on the current status of the Quincy High Swim Team and its coach, Rick Powers. My daughter, Kristen, has been co-captain of the QHS swim team for two years, and will swim on that team again next school year. She currently trains with Coach Powers at Sheridan Swim Club, as do my younger children, Mark, age 13, and Kari, age 12. My oldest son, Mike, swam on the QHS Swim Team and for the last two years has swum on the intercollegiate team at the U.S. Military Academy at West Point. This letter is written from a partly personal, partly professional viewpoint.

As someone who has made the welfare of children and families the primary focus of his professional life, I pay close attention to the extracurricular opportunities available to the young people in our community. I suppose I would not be a normal parent if I did not pay particular attention to the extracurricular activities in which my own children are involved; I suspect that my parental scrutiny is sometimes prompted by a healthy skepticism earned through over twenty years in the justice system. I also find myself asking a lot of questions of my children about the activities in which they engage and about the people with whom they come in contact, especially the adult supervisors. Parental interest and caution is a healthy thing which can benefit children. My wife and I want our children to be involved with beneficial and safe activities. I want the same for the other children in the community.

My four children have been involved in serious, competitive swimming for over twelve years. We have come in contact with a succession of coaches at

Sheridan and at Quincy High, ranging in ability from totally incompetent to superior, ranging in attitude from disinterested to totally dedicated, with commensurate impact on the quality of the program and the opportunity for the kids. The current Quincy High swim coach is the best so far, affording swimmers knowledgeable, professional coaching. His program is consistent with my knowledge of effective coaching and competitive swimming, and I have witnessed nothing inconsistent with good practice in those areas. I would discourage anyone from attempting to change the program or the coach.

The nature of competitive swimming is goal setting, both short and long-term, practice, performance and evaluation. This process makes it extremely valuable for personal physical, emotional and mental development, and is why I believe it serves my children's interests and is valuable to the community. The key to a swim program's success, however, lies almost totally in the ability and attitude of the coach to knowledgeably train, educate, inspire and supervise the swimmers. I have spent a fair amount of time talking with Coach Powers about the aspects of my children training with him, and I am satisfied that my children are in good hands with him and will receive the real benefits that a quality swim program offers.

Frankly, this letter is written with knowledge on my part that a certain misguided individual has been making rumors and innuendos about the Coach and his program. I will not honor that individual's baffling efforts with a description or a response because I believe they fall in the same class of paranoid misrepresentations and falsehoods about the swim team program that the same individual communicated to my wife and me in years past.

Thanks for the opportunity to voice an opinion; feel free to contact me if you have any questions. My wife and I are hopeful that Coach Powers will be retained by the School Board.

The references in the penultimate paragraph to "that individual" and "the same individual" were, and were understood by the recipient to be, references to Mr. Tierney.

Because the letter was attached to the complaint, it became a part of it for all purposes, Fed. R. Civ. P. 10(c); *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 858 (7th Cir. 2002), and so the judge could consider it in deciding the motion to dismiss without having to convert the motion to one for summary judgment. It is possible that he could have done so, for that matter, despite and as it were in the teeth of Rule 12(b)—which says, as does the less frequently invoked Rule 12(c) (motion for judgment on the pleadings), that when the judge considers evidence outside the pleadings he must convert the defendant's motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56—even if the document had merely been referred to in the complaint, provided it was a concededly authentic document central to the plaintiff's claim (the usual example is a contract, in a suit for breach of contract). So at least our decisions in *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994), and *Venture Associates v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993), say, although *Berthold Types Ltd. v. Adobe Systems Inc.*, 242 F.3d 772, 775 (7th Cir. 2001), leans the other way, without, however, citing the earlier cases or discussing the exception, which is narrow: in *Wright* the plaintiff had actually quoted from the document, while *Levenstein* emphasizes that it is indeed "a narrow exception aimed at cases interpreting, for example, a con-

tract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment, and the defendants' perfunctory arguments for the centrality of these documents are unpersuasive." 164 F.3d at 347.

The exception to Rule 12(b) that these cases carve (whatever its precise breadth) has been thought to follow from Rule 10(c); the concern is that, were it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit. *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The cases therefore allow the defendant to submit the document to the court, and the court to consider it, without need for conversion to Rule 56. E.g., *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n. 3 (1st Cir. 1991); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994); see 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, pp. 762-63 (2d ed. 1990). The *White* and *Branch* cases show that the exception is not supported just by cases in this circuit. At a practical level the exception doubtless reflects the pressure on judges in a busy court to dispose of meritless cases at the earlier opportunity.

It can be further argued in support of the exception that the purpose of requiring conversion from Rule 12(b) or Rule 12(c) to Rule 56, if matters outside the pleadings are considered by the court, is to make sure that each party has notice of evidence that the opposing party wants to present in support of his claim or defense; reference in the pleading to the evidence furnishes that notice. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Although this is not a contract case, the letter by Judge Vahle attached to the complaint is potentially (in

fact actually, as we shall see) dispositive of the claim of retaliation against him and so he could have submitted it for the court's consideration, even if the plaintiffs had not attached it to their complaint, without the court's being obliged to convert his motion to dismiss to a motion for summary judgment. What would not be cricket would be for the defendant to submit a document in support of his Rule 12(b)(6) motion that required discovery to authenticate or disambiguate; in such a case the judge would be required to convert the defendant's motion to a Rule 56 motion if he were minded to consider the document in deciding whether to grant the motion. That issue does not arise when the plaintiff by attaching the document to his complaint incorporates and by doing so adopts it as a part of his pleading.

In light of this discussion, the scope of the exception recognized in the cases we have cited is uncertain; perhaps it is or should be limited to cases in which the suit is on a contract or the plaintiff, if he has not attached, has at least quoted from, the document later submitted by the defendant. But we need not resolve the scope of the exception in the present case because the document in question was attached to the Tierneys' complaint and therefore indisputably became a part of it for all purposes.

The letter is charged as one act of retaliation against the Tierneys for Mr. Tierney's complaining about Coach Powers; another is the expulsion of the Tierneys from the swimming club, and there are others including a telephone call to Tierney in which an unknown male voice "said something about swimming and then [Tierney] heard 'mother fucker.'" Tierney's Caller ID revealed that the call had originated from Debbie Olson's phone. Debbie Olson is a teacher employed by the school district; her husband is vice-president of the "booster club," a compo-

nent of the swimming club. A police officer investigated the call, and Mr. Olson told the officer that he knew who the caller was but wouldn't tell him. When the officer threatened to arrest him, Olson relented and said he would tell him later in the week. This satisfied the officer, who left, but the matter was dropped and Olson never did disclose the identity of the caller.

According to the Tierneys, their complaints about Powers were never properly investigated, and he remained the high school swimming coach throughout the period covered by the record.

We begin our analysis of the merits of the appeal with the challenge of the award of attorneys' fees to Mrs. Olson. The plaintiffs do not claim that her husband was a member of the conspiracy to retaliate against them. Their argument is that he aided and abetted his wife, who they claim either was a member of the conspiracy or, even if acting alone as it were in lending her phone to the harasser, was acting under color of law since she was a public employee. There is nothing to connect her to a conspiracy. Even if the complaint alleged that the unknown male caller had asked her permission to use her phone and told her he wanted the permission in order to make a harassing call to the Tierneys (which the complaint does not allege—so far as appears, she didn't know he was using her phone, let alone the purpose for which he was using it) and that she had granted him permission, that would not state a claim of conspiracy, see, e.g., *United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992), though it might make her an aider and abettor. A conspiracy is an agreement, and what is the agreement in the (probably just hypothetical) case just put? Even more clearly than in *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 860 (7th Cir. 1999), or *Fries v. Helsper*, 146 F.3d 452, 458

(7th Cir. 1998), no agreement is alleged. See also *Young v. Murphy*, 90 F.3d 1225, 1233 n. 5 (7th Cir. 1996). The problem is not that the plaintiffs have pleaded conspiracy in general terms, which the civil rules permit, as we emphasized in *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). It is rather that they have accused Mrs. Olson only of conduct that is not conspiratorial; they have in short pleaded themselves out of court. E.g., *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994).

As for the argument that she was acting under state law, there is even less to that than to the parallel claim (discussed below) against Judge Vahle. How was Mrs. Olson's action in letting someone use her private phone to make a call that did not mention her, or make any use of her public position to overawe, intimidate, or otherwise magnify the effect of a private action an action taken under color of state law, a private action that was contaminated by the actor's public status?

In summary, the plaintiffs' claim against Mrs. Olson was frivolous and the district court was therefore within its authority in sanctioning the Tierneys for putting her to the expense of defending herself. *Hughes v. Rowe*, 449 U.S. 5, 14-15 (1980) (per curiam); *Munson v. Milwaukee Board of School Directors*, 969 F.2d 266, 269-70 (7th Cir. 1992). We add that the plaintiffs' lawyer, Richard Steagall, is a repeat offender, see *Serritella v. Markum*, 119 F.3d 506, 512-13 (7th Cir. 1997), who is courting the imposition of sanctions on himself as well as on his clients. In light of his history we have no alternative but to issue an order to show cause why he should not be sanctioned for filing an appeal that in part at least is frivolous.

We move to the dismissal of the claim against Judge Vahle. There are actually two claims against him: that he

acted under color of state law in writing the letter on court stationery and stating in it that his motive was at least "partly professional," and that he conspired with the school district, which if so makes it irrelevant whether he himself was acting under color of state law. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000). We emphasize because of a confusion in some of the cases that if either claim can survive a motion to dismiss, the fact that a letter standing alone is rather a feeble act of retaliation would not by itself sustain the dismissal. The letter could be thought defamatory in accusing Tierney of paranoid misrepresentations, and defamation inflicts sufficient harm on its victim to count as retaliation (as is implicit in cases like *Pitts v. City of Kankakee*, 267 F.3d 592, 596 (7th Cir. 2001); *Mattox v. City of Forest Park*, 183 F.3d 515, 521-23 and n. 3 (6th Cir. 1999), and *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997))—that is, to be capable of deterring the exercise of free speech. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *Mattox v. City of Forest Park, supra*, 183 F.3d at 521.

Some cases, illustrated by *Gini v. Las Vegas Metropolitan Police Department*, 40 F.3d 1041, 1045 (9th Cir. 1994), hold that because the Supreme Court held in *Paul v. Davis*, 424 U.S. 693, 711-12 (1976), that defamation does not deprive the defamed victim of liberty or property within the meaning of the due process clauses of the Fifth and Fourteenth Amendments, it cannot deprive the victim of his First Amendment rights either. But that is a non sequitur. See *Mattox v. City of Forest Park, supra*, 183 F.3d at 521 n. 3; see also *Pitts v. City of Kankakee, supra*, 267 F.3d at 596; *Allen v. Scribner*, 812 F.2d 426, 434 n. 17 (9th Cir. 1987). The fact that reputation, the interest that the law of defamation primarily protects, is not a form of constitutional liberty or property doesn't mean that freedom of

speech is not a constitutionally protected liberty—as of course it is. The distinction between reputation and other interests, some of constitutional stature, that defamation may injure is evident in the cases that hold that although defamation is not a constitutional tort when all it does is injure the plaintiff's reputation, it becomes one when it deprives the plaintiff of his liberty of occupation, an interest protected by the due process clauses as reputation itself is not. See, e.g., *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972); *Atwell v. Lisle Park District*, 286 F.3d 987, 992-93 (7th Cir. 2002); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138-39 (7th Cir. 1984); *Bone v. City of Lafayette*, 763 F.2d 295, 298 (7th Cir. 1985); *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998); *Roley v. Pierce County Fire Protection District No. 4*, 869 F.2d 491, 495 (9th Cir. 1989). Defamation can injure other interests besides the interest (which only state law protects, not the U.S. Constitution) in reputation.

Apart from the stationery, there is nothing to indicate that Judge Vahle's letter was anything other than a personal letter of support of Coach Powers, who had given swimming instruction to three of the judge's kids. Obviously Judge Vahle was not acting within the scope of his judicial office, and it is not alleged that he intended to use his judicial powers against the Tierney family. Nevertheless, if he was somehow using that office to magnify the impact of his private action, like a policeman who uses his uniform or his gun to intimidate a person with whom he is having an entirely private quarrel, he would be acting under color of state law within the meaning of the cases that interpret this term in 42 U.S.C. § 1983. See, e.g., *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118-19 (7th Cir. 1995); but cf. *Barna v. City of Perth Amboy*, 42 F.3d 809, 818 (3d Cir. 1994).

But the fact that a personal letter is written on judicial stationery cannot reasonably be thought to show, all by itself, that the sending of the letter was an act done under color of state law. It can give coloration to other facts indicative of an invocation of official power but no case holds that it is enough by itself, and it would make little sense to hold that. Compare *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979); *Corbitt v. Andersen*, 778 F.2d 1471, 1475 (10th Cir. 1985). Some judges have only their official stationery and use it for their personal as well as official correspondence, and so with their phone and their e-mail. Of course they have to be careful not to create an impression that the power of the office is somehow behind the letter, and so it would be a mistake or worse for a judge to use his official stationery to question a bill or ask for a discount. But there is nothing like that here. It is apparent from the content of the letter that it was written in Vahle's capacity as a father rather than as a judge. No reasonable person could think himself being threatened by the letter with the fell powers of the juvenile court—threatened, for example, with Vahle's removing the Tierneys' children from their custody to punish them for their effrontery in accusing Powers of sexual improprieties. The plaintiffs claim that it is a violation of Illinois rules of judicial ethics for a judge to write a personal letter on his judicial stationery, but no citation is needed for the proposition that a violation of state law is not actionable under section 1983.

There isn't even any indication that Vahle intended or expected that his letter or its contents would ever come to the attention of the Tierneys (it seems rather to have been intended to shore up the standing of Powers, whom Vahle obviously admires, with Powers' boss, the high school athletic director). And if it was not so intended or expected, then this could not possibly be a case of trying

to intimidate a person by brandishing the emblems of one's office.

That leaves for discussion only the charge of conspiracy against the judge. As we have been at pains to emphasize in recent cases, such as *Walker v. Thompson, supra*, there are no heightened rules of pleading a federal case besides those listed in Fed. R. Civ. P. 9, and conspiracy is not on the list. But as we noted in regard to the claim against Mrs. Olson, it is always possible for a pleader (usually the plaintiff, but it needn't be) to plead facts that show the pleading is unfounded. The longer the complaint, the likelier this is, and the Tierneys' complaint is 22 pages long and consists of 78 paragraphs. It appears from the complaint and even more clearly from the Tierneys' brief in this court that their claim is only that the fact that Vahle wrote the letter after receiving Schildt's report from the school district's attorney is by itself proof that he joined the conspiracy. It is no such thing. If the report together with his own knowledge persuaded Vahle that the Tierneys' accusation against the coach was unfounded and even crazy, and Vahle was moved as a result to write a letter in support of Powers, this sequence alone, the only evidence of conspiracy that it appears the Tierneys wish to present, is insufficient evidence to warrant a finding of conspiracy. We repeat that a conspiracy is an agreement, and a spontaneous response to information furnished one is not action pursuant to an agreement. See *Scott v. Greenville County*, 716 F.2d 1409, 1424 (4th Cir. 1983); *Messiha v. State*, 583 N.W.2d 385, 387-88 (N.D. 1998).

The danger of deterring free speech would be great if the sequence of events that we have just described could give rise to an inference of conspiracy. Even judges have some rights of free speech. The premise of the Tierneys' suit is that a complaint about sexual improprieties committed by a public school coach is a matter of sufficient

public interest to be protected by the First Amendment, and if that is correct, which it is, cf. *Brown v. Disciplinary Committee*, 97 F.3d 969, 973 (7th Cir. 1996); *Dishnow v. School District*, 77 F.3d 194, 197 (7th Cir. 1996), the contesting of that complaint must also be protected by the First Amendment—at least prima facie, for of course the First Amendment has not been interpreted to abolish defamation law in its entirety. But while conceivably defamatory, Judge Vahle's letter was probably either privileged as a communication made to enable the recipient to act in the public interest, see, e.g., *Turner v. Fletcher*, 706 N.E.2d 514, 517 (Ill. App. 1999); *Restatement (Second) of Torts* § 598(b) (1977), or as constitutionally protected speech. Mr. Tierney—who appears to have been conducting a vendetta with the school administration—was probably what the cases call a "limited-purpose public figure," one who is as it were fair game but only in respect to the particular controversy in which the person has "gone public" with his ideas or opinions, *Harris v. Quadracci*, 48 F.3d 247, 252 (7th Cir. 1995); *Underwager v. Salter*, 22 F.3d 730, 734 (7th Cir. 1994); *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 709-11 (4th Cir. 1991), so that to be allowed by the First Amendment to obtain relief in a suit against Judge Vahle for defamation he would have had to prove that Vahle knew or was reckless in failing to discover that the criticisms of Tierney in his letter were untrue.

And if for either reason (common law or constitutional privilege) that we have suggested the letter was privileged, the privilege must also defeat a defamation claim dressed up in the language of conspiracy. To evade the constitutional limitations on defamation suits by charging the alleged defamer with participation in a conspiracy, which is to say just by relabeling the tort, cannot be permitted. Cf. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988); *Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408,

1420 (C.D. Cal. 1987). It is too easy a method of circumvention. The relabeling is particularly thin when the substantive tort is being relabeled as a conspiracy to commit it. A newspaper article is not the product of a conspiracy between the journalist who wrote it and the publisher of the newspaper, so that both might be liable for the consequences of the article if it was defamatory even though if each were sued just for defamation rather than for conspiracy to defame both have a good defense under the First Amendment. That would be a nonsensical result.

So while there is no reason to believe that the school district's lawyer asked Vahle to write the high school athletic director, if he did and if by doing so he were deemed to have roped Vahle into a conspiracy, the deterrent effect on freedom of speech could be considerable. What is more natural than for someone who believes that a friend has been wrongly (indeed wrongfully) accused of misconduct to speak out in his defense, which will often involve attacking the friend's critics?

Vahle was properly dismissed from the suit, and likewise (as the plaintiffs concede) the Olsons; and there was no abuse of discretion in requiring the plaintiffs to pay Mrs. Olson's attorneys' fees for opposing their frivolous claim against her.

AFFIRMED.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*