[No. 655-2.    Division Two.    December 18, 1972.]

JOSEPH M. GAZIN, *Respondent,* v. JOHN E. HIEBER *et al., Appellants.*

*James C. Young* (of *Young & Hoff*), for appellants.

*Edward R. Langenbach, Jr.* (of *Short, Cressman & Cable*), for respondent.

PETRIE, C.J.—In order to savor the full flavor of this appeal it seems necessary to provide some background information gleaned from the record. The corporate defendant, Nautilus, Inc., acquired title to an elongated strip of tidelands along Hood Canal in Jefferson County extending in depth from the line of ordinary high tide to the line of extreme low tide. *See Sallee v. Bugge Canning Co.*, 38 Wn.2d 737, 232 P.2d 81 (1951) for an interesting history of title to portions of these tidelands. Some time after its incorporation in 1967, Nautilus began development of these tidelands into building sites aided in part by natural accretion and in part simply by bulkheading and filling. Defendant, John E. Hieber, is president, and defendant, Betty H. Hieber, his wife, is secretary of Nautilus.

For understandable reasons, this activity by Nautilus caused considerable consternation to some of the upland owners. The record is far from precise on this point, but it appears that recording in Jefferson County of the original deed from the State of Washington had been considerably delayed although it was of record in the offices of the

Department of Natural Resources in Olympia. In early October, 1969, at least some of the upland owners instituted an action against Nautilus and others, seeking to quiet title in themselves to that portion of the tidelands extending from the line of ordinary high tide to the government meander line.[1] We are not concerned directly with that lawsuit. However, we have been advised at oral argument herein that the action had not as of that time been completely settled.

The plaintiff, Joseph M. Gazin, wanted to purchase one of the lots Nautilus was developing, but did not want to become directly involved in the existing lawsuit. In mid-October, 1969, Nautilus and Gazin executed an earnest money agreement for the sale and purchase of a 75-foot wide lot extending seaward from the meander line to the line of extreme low tide for $11,250 with the understanding that the seller would convert the partially submerged lot to a suitable building site. The agreement called for a downpayment of $5,000 to be held and distributed by an escrow company. A key provision of the earnest money agreement read:

> Completion of construction of lot to be approved by Bush, Reed & Hitchings as in adjacent parcels. Purchaser hereby authorizes escrow company to disburse funds to authorized contractors as work is completed and approved by above surveyors. Full disbursement shall be made to seller upon final approval of construction.

On January 9, 1970, Gazin made the downpayment of $5,000 directly to Nautilus and the parties executed a real estate contract which provided in part that the contract balance, together with interest thereon, would be paid at

---

[1] One of the interesting sidelights is that a county road traverses a portion of these tidelands. With delightful informality the president of Nautilus had an oral arrangement with county officials that if the county permitted him to move the existing rock bulkheads (protecting the road) out to the low water end of his lots, he would reserve sufficient property in any of his conveyances to permit widening of the road to a 50-foot right-of-way; after completing his development program he would convey all of his reservations to the county.

the rate of $75 per month. The record does not reflect why the contemplated use of the escrow company was abandoned. It does appear, however, that in the interim[2] between the dates of execution of the two documents, the property became encumbered by a mortgage in the amount of $5,500. Concomitant with execution of the real estate contract, and clearly as a part thereof, the parties executed a confidential "agreement" which provided as follows:

1. That pertaining to one real estate contract between Joe Gazin and Nautilus, Inc., a Washington corporation, dated January 9, 1970, there exists the possibility of a price adjustment in the event of forced removal of certain improvements to said described property.

2. That the amount deducted from the balance due seller be set at the cost of said improvements, the seller being solely responsible for the removal of said improvements in such an event.

3. That a title insurance policy (mortgagee type) has been issued on said property in the amount of $5,500.00, said mortgage collected at Hyldahl's, Inc., 7916 Greenwood Ave., N., Seattle, Wash., said mortgage having been recorded.

4. That Nautilus, Inc., is solely responsible for payment of said mortgage, and will use funds from the proceeds of the contract between the parties hereto for the express purpose of retiring said mortgage.

5. That a title policy to purchaser has been paid for and said policy will be delivered as soon as issued by the title company.

6. That the seller is defending and will continue to defend any legal action involving property at South Point, and shall hereby indemnify purchaser for any losses resulting from said action other than in paragraphs 1 & 2, as already provided.

---

[2]Neither party has alluded to the fact that on December 4, 1969, in the interim between execution of the two documents, the so-called "Lake Chelan" case, *Wilbour v. Gallagher,* 77 Wn.2d 306, 462 P.2d 232 (1969) was published. Although there appears to be some disagreement as to the extent of the holding in the "Lake Chelan" case (*see* 45 Wash. L. Rev. 27 and 523 (1970)), the widespread publicity given the opinion undoubtedly caused developers of submerged and partially submerged land considerable apprehension as to the future of their enterprises.

7. Seller will provide the best building site suitable to the environment, unless improvements are continued all the way to the Ferry dock bulkhead, in which case work shall be stabilized as required by Bush, Reed and Hitchings, Engineers, Seattle, or as mutually agreed between the parties hereto. In the event fill can be stabilized without completing bulkhead, cost of said completion shall be deducted from contract balance, said sum not to exceed $750.00.

We pause momentarily at this point to reflect upon the nature of the total contract between Mr. Gazin and Nautilus, Inc. It is not only a contract to sell specified tidelands, but also a construction contract in which Nautilus agreed to improve the property by providing "the best building site suitable to the environment", to be completed at some indefinite time in the future in one of several possible methods not definitely ascertainable at the date of the contract. In addition, it is an indemnity contract, recognizing the existence of pending litigation and possible future litigation, which might have an effect upon the property including the possibility of "forced removal of certain improvements" at some time in the future. The seller specifically agreed to indemnify the purchaser for any losses resulting from said litigation including, but not limited to, a reduction in the purchase price in the event of forced removal of improvements limited to "the cost of said improvements." Finally, the sales contract, itself, is somewhat unusual because the differential between the balance due on the contract and the principal due on the then existing mortgage (recognized as the seller's obligation) is only $750, the amount by which the contract balance will be reduced "in the event fill can be stabilized without completing bulkhead."

For some 14 months following execution of the real estate contract, the parties engaged in discussion and correspondence directed at the progress—or lack of progress—in preparing the tideland property for a building site. The record indicates that by October, 1970, the beach had risen 20 inches through natural accretion and had all but buried

the base rock on the purchased property; that the storms during the winter of 1971 "washed a lot of the top stuff out;" and that as late as October 10, 1972, the date of oral argument before this court, Gazin had not yet been provided with property appropriate for a building site. Furthermore, the litigation, which the parties recognized as pending on the date they executed this contract, was still pending at the time of oral argument before this court.

In April, 1971, plaintiff filed an amended complaint against Nautilus, Inc., and John E. and Betty H. Hieber, individually, in Jefferson County, seeking alternatively rescission or specific performance of the contract including provision for adequate access to the lot by appropriate deed or easement. The amended complaint alleged, in part, that the property "remains less than 50% complete" and "unusable for the purpose for which it was purchased." There was a further allegation that "Defendants' failure to complete the subject lot constitutes a material breach of the contract." Plaintiff obtained the deposition of John E. Hieber, president of Nautilus, Inc., together with answers to requests for admission. In addition, the parties executed and filed with the court a "stipulation", which is more nearly in the nature of partial performance by both parties of their respective contractual obligations. As a part of that stipulation, a statutory warranty deed (presumably from Nautilus to Gazin) was executed and filed "with the Court for keeping with the Court." Gazin promised and agreed to make all mortgage payments to the mortgage holder, and all mortgage payments so made were agreed to be considered as having been made in satisfaction of his obligations under the contract. Based upon these documents, plaintiff moved for summary judgment directing specific performance of the real estate contract. Defendants, John E. and Betty Hieber, moved to be dismissed from the action, both individually and as a marital community. The trial court did not enter any order expressly on Hiebers' motion, but on October 18, 1971, the court did enter an "Order Granting

Plaintiff's Motion for Summary Judgment," the decretal portion of which provides in part:

> 1. Defendants *are liable* to plaintiff for the reasonable *cost of completing* plaintiff's lot *by performing* all tasks required to *fill* the subject property *and construct a bulkhead* to provide a suitable *residential* building lot;
>
> . . .
>
> 3. Defendants are ordered to convey the subject property to plaintiff in fee simple with the usual convenants of warranty *by delivering* to plaintiff the Statutory Warranty Deed now held by the clerk of this court or such other legally sufficient statutory warranty deed as is required.

(Italics ours.)

The recital portion of the order provides in part:

> THIS MATTER having come on regularly for hearing on September 7, 1971, on plaintiff's Motion for Summary Judgment on its Amended Complaint *on the question of liability* against defendants, John E. Hieber and Betty H. Hieber, his wife, and Nautilus, Inc., a Washington corporation, and the court having . . . determined: . . . [t]hat plaintiff is entitled to summary judgment as a matter of law against defendants *on the question of liability* for the reasonable cost of filling the subject property and constructing a bulkhead to obtain a suitable residential building lot, . . .

(Italics ours.)

On the day the court's order was signed, plaintiff's counsel wrote to the clerk of court requesting the deed be forwarded to him pursuant to paragraph 3 of the court's order. The deed was so delivered, and defendants filed their notice of appeal to this court several days later.

Essentially, two broad issues are raised by this appeal, one procedural and the other substantive. (1) Is the order appealable? (2) If the order is appealable, is it warranted on this record? We hold that the order is appealable and that it is not fully warranted on this record. We consider first the procedural problem.

At the outset, we are confronted with a disagreement as to the precise nature of paragraph 1 of the order. Defend-

ants contend that it is an order directed at each of them, as individuals and as a marital community, as well as the corporate defendant, Nautilus, to specifically perform the construction portion of the contract. Plaintiff contends that the paragraph is determinative of the issue of liability only; and further, if it is directed toward the Hiebers, individually or as a marital community, that is only because the trial court has as yet not ruled on their motion. Neither contention is completely correct.

Although the order is not a model of clarity, and the decretal portion uses the phraseology that defendants are liable for the reasonable cost of completing the lot "by performing all tasks required" to fill and bulkhead, the full impact of the order, on its face, indicates that the trial court was determining the question of liability only (and not decreeing specific performance) as to *all* of the defendants.

As to this portion of the order, the trial court was procedurally well advised. It was simply proceeding consistent with the provisions of CR 56(c) which permits "summary judgment, interlocutory in character, . . . on the issue of liability alone". It is quite well established that a determination of this type is not a final order and therefore not appealable pursuant to CAROA 14. *Maybury v. Seattle*, 53 Wn.2d 716, 366 P.2d 878 (1959); *Hontz v. White*, 56 Wn.2d 538, 348 P.2d 420 (1960). (We ignore, for the moment, the question of whether or not the trial court may validly act upon defendants' motion to dismiss at some time in the future.)

Our concern with the appealability of this order does not center on paragraph 1, however, but rather on paragraph 3. That paragraph ordered the statutory warranty deed on file with the court be *delivered* to plaintiff. Plaintiff contends that the order to deliver the deed is not a final order from which an appeal can be taken, primarily because delivery of the deed was merely one of several claims for relief, and because the trial court did not make the express "determination and direction" provided for in

112

CR 54(b)[3] that "there is no just reason for delay." Therefore, plaintiff concludes, the order must be something less than a "final" order. We must disagree.

By its terms, CR 54(b) applies only when more than one claim for relief is presented or when multiple parties are involved. It grants the trial court discretionary authority to enter a "final judgment as to one or more but fewer than all of the claims or parties" even though the court "adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties." We are not here concerned with an order which purports to adjudicate the rights and liabilities of fewer than all the parties. We direct our attention, then, to whether or not more than one claim for relief has been presented. In order for a complaint to set out multiple claims for relief, each claim must arise from a different factual occurrence or transaction. *Reeves v. Beardall,* 316 U.S. 283, 86 L. Ed. 1478, 62 S. Ct. 1085 (1942). Under such a test, it is readily apparent that all of plaintiff's claims for relief are in reality only one claim for relief. Accordingly, determination of the degree of finality of the order appealed from must be based upon consideration of something other than CR 54(b).

Plaintiff appears to suggest, but does not seriously urge, that the order was entered pursuant to CR 56(d).[4] It is

[3]CR 54(b) provides: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination in the judgment, that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

[4]CR 56(d) provides: "If on motion under the rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the

quite apparent that the order was not entered in conformity with the requirements of CR 56(d); rather there was no apparent effort to comply with it. Hence, determination of finality is based purely and simply on the pre-rule standards of whether or not partial adjudication of a single claim results in a final judgment.

Quite obviously, a final judgment need not be the last order entered in any litigation; determination of finality is a matter of substance and not form. *Nestegard v. Investment Exch. Corp.*, 5 Wn. App. 618, 489 P.2d 1142 (1971). When a litigant is required to deliver physical property to his protagonist by reason of an order which does not adjudicate the entire claim—if the order be deemed interlocutory and not appealable—he may refuse and face the possibility of contempt proceedings or he may comply and face the possibility that by the time a "final" order is entered his property is irrevocably beyond his reach. Litigants are not (usually) funambulists. They should not be required to glide across the intervening time period waiting either for the sword to fall or the chickens to scatter.

Almost 125 years ago the Supreme Court of the United States, speaking through Chief Justice Taney, in an appeal from a decree which required delivery of deeds and also ordered an accounting, declared:

> And when the decree decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be sold, . . . and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, and authorizes an

pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action, the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

appeal to this court, although so much of the bill is retained in the Circuit Court as is necessary for the purpose of adjusting by a further decree the accounts between the parties pursuant to the decree passed.

*Forgay v. Conrad,* 47 U.S. (6 How.) 201, 12 L. Ed. 404, 406 (1848). The *Forgay-Conrad* rule has become a firmly established rule of necessity.[5] *Radio Station WOW, Inc. v. Johnson,* 326 U.S. 120, 89 L. Ed. 2092, 65 S. Ct. 1475 (1945); *Kasishke v. Baker,* 144 F.2d 384 (10th Cir. 1944); *Biggins v. Oltmer Iron Works,* 154 F.2d 214 (7th Cir. 1946); *Durkin v. Mason & Dixon Lines, Inc.,* 202 F.2d 425 (6th Cir. 1953). Professor Moore explains the rule in the following manner:

> In principle and under the general rule, a partial adjudication of a claim is interlocutory and non-appealable as a final order. *Forgay v. Conrad* and its progeny make an exception thereto by according "finality" to a partial adjudication—that is, in truth, interlocutory—where the trial court has given final effect to its adjudication and the losing party might be subjected to irreparable injury if appellate review had to await the final outcome of the litigation. Thus in *Forgay v. Conrad* a judgment directing immediate delivery of physical property to a party was held final for purposes of supporting an appeal, although the judgment also contained a provision for an accounting relative to that property.

(Footnotes omitted.) 6 J. Moore, *Federal Practice* ¶ 54.32, at 491 (1972). For a more detailed explanation of the rule *see* 9 J. Moore, *Federal Practice* ¶ 110.11 (1972).

From the foregoing, we conclude that the trial court's order of October 18, 1971 was an appealable final judgment. The appeal therefrom not only brings the entire order before us for review, but also any order made in the same action either before or after the judgment. *Lewis County Sav. & Loan Ass'n v. Black,* 60 Wn.2d 362, 374 P.2d 157 (1962).

---

[5] The *Forgay-Conrad* rule does not appear to have been specifically adopted in the second circuit. In a footnote comment in *Rabekoff v. Lazere & Co.,* 323 F.2d 865 (2d Cir. 1963), the court referred to the problem and suggested the remedy lies through use of a writ on the theory that the trial court had exceeded its jurisdiction.

We revert, first, to the question we had previously ignored temporarily—whether or not the trial court may validly act upon the defendants' motion to dismiss Mr. and Mrs. Hieber, individually and as a marital community. There can be no doubt that the order was all inclusive as to all of the defendants. The issue therefore is whether or not there was any factual foundation in the record to support a judgment against John E. and Betty H. Hieber. Clearly, there was no factual basis whatsoever to enter judgment against anyone except the corporate defendant. The order must be so modified.

We consider next whether or not the trial court was warranted in entering judgment on the question of liability against the corporate defendant for the reasonable cost of filling the subject property and constructing a bulkhead to provide a suitable residential building lot. Here we deem the essential question to be whether or not a reasonable period of time had elapsed to ascertain if the property would accrete naturally and stabilize naturally to provide an appropriate building site. Nautilus vigorously contends a fact question was presented. However, in a letter addressed to Gazin in October, 1970, Hieber considered Nautilus' obligation past due by his own declaration that he was "quite embarrassed by the delay, although I thought at the time that natural accretion would do a much better job than I could." Viewing the record in the light most favorable to the nonmoving party, we find the trial court was clearly warranted in finding that a reasonable period of time had elapsed for Nautilus to have completed its construction obligation. The trial court quite wisely foresaw the futility of attempting to decree specific performance of the construction contract in view of the pending and potential litigation. It accepted Gazin's suggested alternative to specific performance—damages for failure to perform.

We need not tarry long on the question of whether or not the deed, and incidentally the purchaser's title policy, should be delivered to the purchaser. By the terms of the contract, both deed and title policy were to be delivered

116

upon payment of the purchase price in full. Although there is no indication in the record that the purchase price had been paid in full, counsel for Nautilus has conceded at oral argument that the reasonable cost of filling and bulkheading will exceed the maximum conceivable amount of the contract balance.

We have been advised that while this matter was pending before this court, the trial court entered a further order determining the cost of completion of the subject lot. The filing of the appeal divested the trial court of jurisdiction to enter such an order. Accordingly, that order is hereby vacated.

The order appealed from is modified as indicated herein and the trial court is directed to proceed in conformity with CR 56(d) and thereafter to proceed to trial to resolve any material facts thereafter remaining which are actually and in good faith controverted.

PEARSON and ARMSTRONG, JJ., concur.