# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

HOLDEN-MCDANIEL PARTNERS, LLC, )
)
        Appellant, )
)
   v. )
)
CITY OF ARLINGTON, a municipal )
corporation; WOODLAND RIDGE, a )
joint venture; KAJIMA DEVELOPMENT )
CORP., A JOINT VENTURE; )
ARLINGTON COUNTRY CLUB, INC., )
a joint venture; BNSF RAILWAY )
COMPANY, a Delaware corporation, )
)
        Respondents. )
)
HOMESTREET BANK, formerly known )
as CONTINENTIAL SAVINGS BANK; )
BANNER CORPORATION, formerly )
known as FIRST SAVINGS BANK OF )
WASHINGTON; VINE STREET FUND, )
LLC; U.S. BANK NATIONAL )
ASSOCIATION, a subsidiary of U.S. )
BANCORP; SEATTLE MORTGAGE )
COMPANY; PBW, LLC; GLENEAGLE )
COUNTRY CLUB ASSOCIATION; )
)
        Petitioners )
)

No. 73528-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: January 9, 2017

SPEARMAN, J. — Appellant Holden McDaniel Partners, LLC (HM) brought

claims against the City of Arlington, Burlington Northern Santa Fe (BNSF) Railway

Company, and the developers of the neighboring property, Gleneagle, for

designing, developing, operating and maintaining a stormwater management

system that caused stormwater runoff and flooding on HM's property. The trial court dismissed HM's claims on summary judgment based on a release agreement executed by the parties, the statute of limitations, and HM's failure to establish damages. Because the trial court erred in dismissing HM's claims based on the release agreement and because there are disputed issues of material fact as to whether HM established its claimed damages, we reverse the trial court on those issues. We otherwise affirm.

## FACTS

Appellant Holden-McDaniel Partners, LLC ("HM") owns property in Arlington, Washington, at 18520 67th Avenue North (Property). HM purchased the Property in 1986 and manufactured steel under the company name HCI Steel Products, Inc. The Property was bordered by a forested hill to the east and by railroad tracks on the west. There was a culvert on the Property that carried drainage from the eastern slope across the Property and discharged it into a ditch near a right-of-way belonging to respondent BNSF. The water then passed through a culvert under the right-of-way and flowed to the south.

Beginning in the 1980s, the area east of the Property was being developed into a residential community and golf course known as Gleneagle. In 1989, respondents Woodland Ridge, Kajima Development Corp., and Arlington Country Club, Inc. (WRJV) purchased the development rights to Gleneagle. Respondent City of Arlington (City) and WRJV entered into a rezone contract where WRJV paid the City to upgrade the downstream stormwater system to accommodate the increased stormwater runoff from the project. The Property flooded in November 1990, when

2

the stormwater retention pond to the east (W-1) overflowed. The same thing happened in December 1994, November 1995, and December of 1996.

In 1994, WRJV enlisted Triad Engineering (Triad) to develop a master drainage plan for Gleneagle. Triad determined that the existing facilities were insufficient and on February 2, 1995, contacted the City to suggest that an enhanced system be constructed on HM's property. At that time, HM had submitted plans for a new manufacturing building. It is unclear from the record whether HM had agreed to accommodate the runoff from Gleneagle as well as its own stormwater issues. Eventually HM agreed to move the existing culvert south and installed it "at a steeper slope and with an inlet configuration which allowed for greater surcharging at the upstream end. . . ." Clerk's Papers (CP) at 1185. But it refused to install a larger pipe because it would protrude above ground and make the area unusable.

The City issued a permit for HM's proposed new building but withheld authorization to begin construction because HM would not install a pipe with greater carrying capacity. On May 5, 1995, HM filed suit under Snohomish County Superior Court cause No. 95-2-03498-3 against the City for damages resulting from the delay in permitting and withholding of construction (Permit Lawsuit). HM brought statutory claims under RCW 64.40.020, which allows an action "for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority," and under 42 U.S.C. § 1983 for denial of substantive due process. Id. At the same time HM filed the complaint, it also filed a "Claim for Damages" which alleged that the City negligently approved the stormwater

collection, retention, and discharge system for Gleneagle, causing damage to the Property in the amount of $750,000. CP at 660. The Claim for Damages referenced a letter to the City dated March 20, 1995, wherein HM informed the City that it "may very well have liability" for the flooding on HM's property. CP at 663.

A few days later, HM filed suit against WRJV and other developers under cause No. 95-2-03599-8 for failing to implement an appropriate stormwater collection, retention, and discharge system and causing surface water to be discharged onto the Property (Flooding Lawsuit). On July 7, 1995, HM added the City as a defendant in the Flooding Lawsuit, in which its claims against the City mirrored those contained in the Claim for Damages. On August 31, 1995, the court granted the City's motion to consolidate the two lawsuits under cause No. 95-2-03599-8.

In September 1995, the City granted HM's building permit in exchange for a prescriptive drainage easement across the Property. On September 26, 1995, HM executed a hold harmless agreement in favor of the City "to the extent that a 24" x 36" drainpipe is inadequate to handle the flow of surface water legally conveyed to [HM's] property. . . ." CP at 1364. Also in 1995, WRJV enlisted Higa Engineering to design an additional upstream detention facility known as pond W-2. The pond was constructed and finished in 1996.

On November 24, 1998, HM and the City reached a settlement in which HM agreed to release certain of its claims against the City (Release). On motion of the court clerk, the consolidated lawsuit was dismissed without prejudice for want of prosecution in 2000.

4

In 1999 the City installed a second culvert under the railroad tracks to alleviate backwatering. In 2001, the City retained Earth Tech to design a 67th Avenue improvement project that involved widening the roadway and redirecting the outflows from W-1. Earth Tech designed a v-notched weir that would limit the flow to HM, and excess water was rerouted to a new facility north of 188th Street known as the Triangle pond. As part of the improvements, the City lowered the road near HM's north building. The City claims this was done at HM's request. HM disputes this claim.

HM experienced no flooding at all on its property from 2003 until 2009, when flooding occurred after a series of storms. Also in that year, HM replaced its onsite filtration system. In 2007, the business was sold to Bluescope Buildings North America, Inc. (BBNA). BBNA leased the Property and facilities from HM until 2012 when the parties reached an agreement releasing BBNA from the lease in exchange for $2.6 million.

In January 2011, HM filed suit against the City, WRJV and other Gleneagle investors, alleging that the developers were negligent in their design and maintenance of Gleneagle's stormwater system. HM also claimed that the City was negligent in its design, construction, and maintenance of the stormwater facilities that receive water from Gleneagle, and for reviewing and approving Gleneagle's permit and design. HM also brought an inverse condemnation claim against the City.

HM alleged that the City's negligence had caused increased flooding of the Property, which constituted an ongoing nuisance as well as past trespass of surface

5

waters and the threat of future trespass. HM claimed that it had incurred clean up and restoration costs for past floods and was facing a loss of over $6 million if it were to lose its lease with BBNA due to flooding. In 2012, HM added BNSF as a defendant, claiming that BNSF had contributed to the increased flooding by failing to maintain its portions of the stormwater system.

The parties brought multiple motions for summary judgment in early 2015. The trial court dismissed each of HM's claims that arose from alleged conduct by the City and WRJV that occurred before May 5, 1995, concluding that the Release precluded any liability on those claims. The court also found that res judicata barred the assertion of HM's claims against the City and WRJV that arose before November 24, 1998, the date the Release was signed. The court also dismissed HM's claims against the City and WRPV because it found that HM's evidence failed to establish an issue of material fact as to its claimed damages. The court dismissed HM's intentional tort claims for nuisance and trespass, concluding that those claims were subsumed within HM's negligence claims. It also dismissed the claims against BNSF, finding that they were precluded by the statute of limitations. Finally, the court excluded a letter offered by HM in support of its damages claim, concluding that it was inadmissible hearsay. HM appeals these rulings.

## DISCUSSION

We review a trial court's grant of summary judgment de novo. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See

CR 56(c); Camicia, 179 Wn.2d at 693. When making this determination, we consider all the facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

The Scope of the Release

The Release first states that for the sole consideration of $750,000, HM discharges:

> The City ... and all other persons ... from any and all claims ...
> relating to all claims set forth in and described in Plaintiff's
> Complaint and Amended Complaints in Snohomish County Cause
> No. 95-2-03599-8 and/or 95-2-03498-3.[1]

CP at 1107. Next, the Release explicitly provides that any claims related to future flooding on HM's property are excluded from the release, unless they fall within a specific exception. It states:

> This Release does not release any future claims which the
> Plaintiff may have... against the City of Arlington, ... or any other
> person, ... relating to flooding on Plaintiff's property, except to the
> extent said claims arise out of the conduct described in the
> Complaint and Amended Complaints in Snohomish County Cause
> No. 95-2-03498-3. Id.

It is abundantly clear from this language that the Release does not apply to any future claims that HM might have regarding flooding on its property, unless the claims arise from conduct described in the cause No. 95-2-03498-3 complaint. At

---

[1] As previously noted, cause No. 95-2-03498-3 was the original cause number of the Permit Lawsuit which was consolidated with the Flooding Lawsuit under cause No. 95-2-03599-8. There was no amended complaint filed in the Permit Lawsuit, however, there were two amended complaints filed in the Flooding Lawsuit.

issue is what conduct the parties intended to describe by reference to that complaint.

We interpret settlement agreements the same way as other contracts. McGuire v. Bates, 169 Wn.2d 185, 188, 234 P.3d 205 (2010) (citing Mut. of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008)). We attempt to determine the parties' intent by focusing on their objective manifestations as expressed in the agreement. Id. at 189. We generally give words their ordinary and usual meaning unless the entirety of the agreement clearly demonstrates a contrary intent. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). But we interpret only that which was written, not what was intended to be written. Id. The parties' subjective intent is generally irrelevant if "an intention corresponding to the reasonable meaning of the words used" can be imputed. Id.

HM contends that the reference in the Release to the Permit Lawsuit complaint is to the conduct described in the complaint, that is, claims for flooding damages arising out of the City's alleged wrongful withholding of HM's authorization to begin construction. The City and WRJV contend the reference is to the conduct described in the complaint and the Claim for Damages that was filed at the same time. They contend the Claim for Damages was attached to the complaint when it was filed and served on the City. Citing Superior Court Civil Rule (CR) 10(c), they argue that as a result, the Claim for Damages became a part of the complaint. The City and WRJV also contend that the settlement agreement makes no sense unless it is read to include future flooding damages.

8

HM disputes that the Claim for Damages was attached to the complaint. And even if it was attached, HM disputes that the document falls within the reach of CR 10(c). They also contend the Claim for Damages was filed for the sole purpose of providing the City with the statutorily required 60-day notice of HM's claims against it. (See former RCW 4.96.020 (1995), in effect at the time.)[2] HM points out that just over 60 days following service of the Claim for Damages, it amended the complaint in the Flooding Lawsuit adding the City as a defendant.[3] HM further points out that had the Claim for Damages actually been part of the Permit Lawsuit, the claims would have violated former RCW 4.96.020 and been barred as a result. HM also argues that the language of the Release is plain and unambiguous and should be given effect as written.

---

[2] Former RCW 4.96.020 provided as follows:

(1) The provisions of this section apply to claims for damages against all local governmental entities.

(2) All claims for damages against any such entity for damages shall be presented to and filed with the governing body thereof within the applicable period of limitations within which an action must be commenced.

(3) All claims for damages arising out of tortious conduct must locate and describe the conduct and circumstances which brought about the injury or damage, describe the injury or damage, state the time and place of the injury or damage occurred, state the names of all persons involved, if known, and shall contain the amount of damages claimed, together with a statement of the actual residence of the claimant at the time of presenting and filing the claim and for a period of six months immediately prior to the time the claim arose ....

(4) No action shall be commenced against any local governmental entity for damages arising out of tortious conduct until sixty days have elapsed after the claim has first been presented to and filed with the governing body thereof ....

[3] The trial court initially determined that HM filed the Flooding Lawsuit only five days later, instead of waiting 60 days. On HM's motion for reconsideration, the court acknowledged its error on this point, but it concluded that "the result is the same." CP at 35.

9

We first address the City and WRJV's reliance on CR 10(c) to argue that as a matter of law the Claim for Damages was incorporated into the Permit Lawsuit complaint. We conclude that their reliance is misplaced. CR 10(c) states:

> **Adoption by Reference; Exhibits.** Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

Citing P.E. Systems, LLC v. CPI Corp., 176 Wn.2d 198, 289 P.3d 638 (2012), the City and WRJV argue that our supreme court "made it clear" that a document attached to the complaint is part of the complaint. Br. of WRJV at 29, Br. of the City at 20. But the holding of the case does not stretch the application of CR 10(c) nearly so far as that. At issue in P.E. Systems, was whether a contract attached to an answer to a complaint became a part of the pleading. The court noted that the rule expressly states that it applies to "written instruments" and that "'[i]nstrument' has a specific legal meaning: 'A written legal document that defines rights, duties, entitlements, or liabilities, such as a contract, will, promissory note, or share certificates.'" Id. at 204 (quoting BLACK'S LAW DICTIONARY 869 (9th ed. 2009)). The court easily concluded that the purported contract fell within the meaning of a "written instrument" and held that under CR 10(c) "the contract does become part of the pleadings by simply attaching it. . . ." Id. The court cautioned, however, that "exhibits that stretch the definition of a 'written instrument,' such as affidavits, are extrinsic evidence that may not be considered as part of the pleadings." Id. at 205 (citing Rose v. Bartle, 871 F.2d 331, 339 n.3 (3d Cir. 1989)).

10

The City and WRJV nevertheless argue for an expansive view of the definition of "written instrument" as that term is used in CR 10(c), but they cite no Washington authority in support of that position. Instead, they rely on a number of federal cases citing to the similarly worded Fed. R. Civ. P. 10(c). For example, they note that in P.E. Systems, 176 Wn.2d at 204, our supreme court cited Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002) with approval. In that case, the court held that "[b]ecause the letter was attached to the complaint, it became a part of it for all purposes." Tierney at 738. But in indicating its approval of the case our supreme court noted only that Tierney held that the "weight of authority permits attachment of documents such as contracts to pleadings for federal rule 12(b) or 12(c) purposes." P.E. Systems, 176 Wn.2d at 204-05. (Emphasis added). The court clearly did not adopt the view advanced by the City and WRJV that any document attached to a pleading becomes a part of the pleading itself.[4]

Neither the City nor WRJV explain how the Claim for Damages purportedly attached to the Permit Lawsuit complaint falls within the definition of a written instrument as expressed by our supreme court in P.E. Systems. Neither suggests that it defines rights and duties like a contract, will, promissory note or share certificate or that it establishes any entitlements or liabilities. It is a claim for

---

[4] Indeed, following its limited approval of Tierney's apparently expansive reading of the federal rule, the P.E. System court cited approvingly the narrow approach taken in Rose, 871 F.2d at 339 n.3. There the Rose court noted "[t]he case law demonstrates, however, that the types of exhibits incorporated within the pleadings by Rule 10(c) consist largely of documentary evidence, specifically, contracts, notes, and other 'writing[s] on which [a party's] action or defense is based'," (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1327, at 489). And interestingly, although the court in Tierney spoke in expansive terms about the scope of federal Rule 10(c), the letter at issue in that case is actually consistent with the view expressed in Rose. The plaintiffs in that case claimed the letter was both defamatory and retaliatory against the plaintiffs' exercise of their constitutional rights. Thus, the letter was a writing on which the plaintiffs' action was based.

damages but it is not by any stretch, documentary evidence that forms the basis for the claim. We conclude that the Claim for Damages is more akin to an affidavit and, as such, it is extrinsic evidence and not, as a matter of law, a part of the document to which it was attached.

Next, the City and WRJV argue vigorously that we should interpret the Release to include the claims in the Flooding Lawsuit because otherwise, in their view, "the settlement agreement makes virtually no sense[.]" Br. of the City at 27. See Br. of WRJV at 27-28. We turn first to the plain language of the Release. It unambiguously states that HM specifically reserved the right to bring future flooding claims "except to the extent said claims arise out of the conduct described in the Complaint … in Snohomish County Cause No. 95-2-03498-3." CP at 1107. It is undisputed that the claims arising out the conduct in the Permit Lawsuit are unrelated to the claims alleged in the Flooding Lawsuit. It is also undisputed that the Claim for Damages, which does address the claims in the Flooding Lawsuit, is not explicitly mentioned anywhere in the Release.

Despite the unambiguous clarity of the language in the Release, the City and WRJV argue that we must take into account what, in their view, the settlement agreement was intended to accomplish. The City points out that in reaching the agreement it intended to "end[] the litigation, including future claims related to 'permanent or progressive damage' arising out of the litigated subject matter." Br. of the City at 30. But to the extent the City believed the Release included all future flooding damage on HM's property without exception, that belief is in direct contradiction to the plain language in the Release. The Release provides "[t]his

12

Release does not release any future claims which the Plaintiff may have ... against the City of Arlington ... or any other person ... relating to flooding on the Plaintiff's property" unless the claims arise out of the Permit Lawsuit. CP at 1107 (emphasis added). It is well settled that courts are not at liberty to rewrite contracts to reflect a party's unexpressed, subjective intentions. Hearst Commc'ns, 154 Wn.2d at 503. And that is what the City and WRJV ask us to do here.

Accordingly, we hold the trial court erred in denying HM's motion for summary judgment dismissal of the affirmative defense of release and in granting dismissal of HM's claims on that ground.

Res Judicata

Res judicata prohibits a party from bringing a claim already litigated or a claim that could have been litigated in a prior action. Pederson v. Potter, 103 Wn. App. 62, 67, 11 P.3d 833 (2000). This doctrine prevents repetitive litigation of the same matter, ensuring integrity and finality in the legal system. Id. at 71. A threshold requirement of res judicata is a final judgment on the merits in the prior suit. Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 865, 93 P.3d 108 (2004). Once obtained, a prior judgment has preclusive effect when a second action is identical in: (1) persons and parties; (2) cause of action; (3) subject matter; and (4) quality of persons for/against whom the claim is made. Yakima County v. Yakima County Law Enforcement Officers Guild, 157 Wn. App. 304, 327-28, 237 P.3d 316 (2010). Whether res judicata bars an action is a question of law we review de novo. Kuhlman v. Thomas, 78 Wn. App. 115, 120, 897 P.2d 365 (1995).

The parties do not appear to dispute that there was no judgment on the merits entered in this case. After the Release was signed the parties took no further action with regard to obtaining a judgment. Instead, the case was dismissed without prejudice on the court clerk's motion "for want of prosecution" pursuant to CR 41(b)(2). It is well settled that a dismissal order entered without prejudice will not support a res judicata defense because it is not a final judgment.[5] Young v. Key Pharmaceuticals, Inc., 112 Wash.2d 216, 223, 770 P.2d 182 (1989)

Nevertheless, the City and WRJV argue that the prior settlement "ended the litigation for all intents and purposes." Br. of City at 37-38. Citing Rasmussen v. Allstate, 45 Wn. App. 635, 726 P.2d 1251 (1986), they contend that even in the absence of a final judgment on the merits, the Release triggered res judicata. In Rasmussen, following a car accident, a passenger secured partial payment from the tortfeasor and then brought suit against Allstate and Farmers seeking underinsured motorist (UIM) coverage. Allstate disputed that the policy included UIM coverage but the trial court ruled otherwise and Allstate appealed. While the appeal was pending, Allstate settled with the passenger, but apparently did not dismiss the appeal. Allstate then prevailed in an action seeking contribution from Farmers. Farmers appealed and the case was consolidated with Allstate's appeal challenging the coverage finding. In considering Allstate's appeal, the court reviewed the settlement agreement between Allstate and the passenger. The

---

[5] The City appears to argue that dismissal without prejudice can be a final judgment. Br. of the City at 38. It cites Gazin v. Hieber, 8 Wn. App. 104, 113, 504 P.2d 1178 (1972), for the proposition that a "[d]etermination of what constitutes a final judgment in the context of res judicata has always been a 'matter of substance and not form.'" Br. of the City at 38. But because it cites no authority holding that a dismissal without prejudice is a final judgment, we reject the argument.

14

agreement provided that, in consideration for the sum received, the passenger

agreed to:

> release and forever discharge ALLSTATE INSURANCE
> COMPANY ... from any and all rights, claims, including claims for
> underinsured motorist benefits, or damages of any kind, known or
> unknown, existing or arising in the future, resulting from or related
> to injuries or damages arising from an accident that occurred on or
> about October 6, 1981.

Id. at 637. The court concluded that it need not reach Allstate's claim on appeal

because the

> "compromise agreement constitutes a merger and bar of all existing
> claims and causes of action and is as binding and effective as a final
> judgment itself. Gregory v. Hamilton, 77 Cal.App.3d 213, 142
> Cal.Rptr. 563 (1978); 15A Am.Jur.2d Compromise and Settlement §
> 24 (1976). It is res judicata of all matters relating to the subject matter
> of the dispute. Handley v. Mortland, 54 Wash.2d 489, 342 P.2d 612
> (1959); In re Estate of Phillips, 46 Wash.2d 1, 278 P.2d 627 (1955).
> Therefore, the scope of the coverage by Allstate is no longer an
> issue." Id.

Despite its broad language, the City and WRJV's reliance on Rasmussen for

the proposition that a settlement agreement is res judicata, in the absence of a

judgment, is misplaced. First, the two cases cited in support of the assertion,

Handley and Phillips, both involved settlement agreements that were followed by

entry of judgments. In Handley, the court, in approving the settlement of a minor's

claim entered "findings of fact, conclusions of law, and judgment." Id. at 491. In

Phillips, the parties agreed to settle a dispute about the distribution of the

decedent's estate. The court held that "[a]n order settling the final account of an

administrator and a decree of distribution entered on the basis of such a

compromise or settlement are res judicata of all matters relating to the subject

matter of the controversy." Id. at 14 (citing McClure v. Calispell Duck Club, 157

15

Wash. 136, 288 Pac. 217 (1930)). In this case, because the settlement agreement was not followed by entry of either a judgment or a decree, we conclude that res judicata is inapplicable.[6]

Furthermore, regardless of whether res judicata applies, it is well settled that the law favors private settlements of disputes and is inclined to view them with finality. Stottlemyre v. Reed, 35 Wn. App. 169, 173, 665 P.2d 1383 (1983). But the finality of the Release at issue here is not in dispute. The parties disagree on the scope of the Release, specifically whether it includes damages for flooding as asserted in the Claim for Damages. That dispute is to be resolved by resorting to principles of contract interpretation, not according to the law regarding the enforceability of judgments. Id. at 171. We reverse the order granting the City and WRJV summary judgment on this issue.

## HM's Claimed Damages From post-1995 Conduct

HM argues that the trial court erred when it entered partial summary judgment with regard to damages. The trial court concluded that HM could not establish any flooding damages because there was no net increase in frequency of flooding after 1995. Relying on HM's expert witness, Malcolm Leytham, the court found that prior to the development of Gleneagle, HM's property flooded at a rate of

---

[6] We also reject the argument by the City and WRJV that Pederson, 103 Wn. App. at 67 is controlling. That case considered whether the "confession of judgment" at issue in that case could qualify as a judgment on the merits. The court held that it could "because the Pedersons knew of their potential claims against the Potters when they settled and signed the confession of judgment. They had the opportunity to be heard on these claims, and have them disposed of, but chose not to do so." Id. at 71. But again, in Pederson, unlike this case, a judgment had in fact been entered. In addition, the confession of judgment reflected that the Pedersons had abandoned all of their claims against the Potters. Here, it is undisputed that HM reserved at least some of its claims.

once every 25 years. By 1995, however, after the development of Gleneagle and the construction of Pond W-1, HM's property flooded at a rate of once every three years. By 1998, following installation of Pond W-2 and the 36" x 24" pipe across HM's property, the flood rate was reduced to once every 15 years. But, after additional work by the City, including installation of Triangle Pond and lowering 67th Avenue, the flooding worsened to once every ten years by 2003 . The court concluded, however, that because flooding once every ten years was better than once every three years, "no rational trier of fact could find that [HM] suffered flooding damage more severe than was negotiated for in the prior litigation." CP at 24. The City and WRJV adopt this reasoning on appeal.

HM argues that there are disputed issues of material fact about whether the City is responsible for the improvement from every three year flooding to every fifteen year flooding. It points to evidence that the improvement was due primarily, if not solely, to HM's installation of the larger 36" x 24" pipe and relocating it to a steeper slope. [7] It further argues that the City's installation of Triangle Pond and

---

[7] The City argues that this theory was not argued below by HM until its motion for reconsideration. The City and WRJV also argue that Leytham's deposition testimony does not support the theory. HM argues that the reason for the improvement in flooding conditions from every three years in 1995 to every fifteen years in 1998 was not a contested issue until the trial court's summary judgment decision. HM contends that until then, the parties were using 1998 as the baseline for determining whether flooding conditions had worsened. The record supports HM's argument on this point. See CP at 2576; 2578-79. The City and WRJV are correct that Leytham did not specifically testify in support of the theory HM argued in the motion for reconsideration, i.e., that laying the culvert pipe at a steeper grade accounted for the improvement by 1998. But it is a reasonable inference from the evidence that was presented below. Viewing the evidence in the light most favorable to HM, as we must, it is sufficient to raise a material issue of fact as to HM's damages claim. We also note that in response to HM's motion for reconsideration, the City argued to the trial court, and does so here on appeal, that even accepting HM's new theory, the evidence of HM's damages claim was insufficient to survive its motion for summary judgment. See Br. of the City at 45-47. But these issues were not addressed by the trial court and we do not address them here.

lowering 67th Avenue is solely responsible for the increase to every ten-year flooding. If a rational factfinder were to credit HM's evidence it could conclude that the City and WRJV bore some liability for the five-year increase in flooding frequency. Because resolution of the damages issue turns on questions of credibility, the trial court erred when it granted summary judgment on this issue.

<u>HM's Intentional Tort Claims</u>

HM argues that its claims for trespass should not have been dismissed because there is an issue of material fact as to whether WRJV intended to flood the Property, stating that WRJV knew it's conduct was "'substantially certain'" to result in flooding, or that there was a high probability of increased flooding. Br. of HM at 41. To establish intentional trespass, a plaintiff must show (1) an invasion of property affecting an interest in exclusive possession; (2) an intentional act; (3) reasonable foreseeability the act would disturb the plaintiff's possessory interest; and (4) actual and substantial damages. <u>Bradley v. Am. Smelting & Refining Co.</u>, 104 Wn.2d 677, 692-93, 709 P.2d 782 (1985). Intent requires proof that the actor "desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." <u>Bradley</u>, 104 Wn.2d at 682. At a minimum, this consists of proof that the actor has knowledge that the consequences are certain, or substantially certain, to result from his conduct and proceeds in spite of the knowledge. <u>Id.</u>

HM argues that the City and WRJV had "intent" because they knew that their actions were "'substantially certain'" to result in flooding because the City authorized the W2 pond to discharge at a rate greater than the known capacity of

the culvert located on the Property. HM is essentially arguing that the City and WRJV knew that the culvert was insufficient and failed to take that into account when it designed and implemented the various elements of a stormwater management system. A claim for failure to act sounds in negligence and does not support the intentional act needed for trespass. Estate of Price v. City of Seattle, 106 Wn. App. 647, 660, 24 P.3d 1098 (2001).

<u>HM's claims against BNSF</u>

HM argues that the trial court erred when it found that BNSF had no statutory or common law duty to accept water from upstream entities and dismissed its negligence claims against BNSF. According to HM, by voluntarily allowing the City and Gleneagle to use the ditch as a stormwater disposal facility, BNSF assumed a duty to maintain the ditch in good repair. BNSF argues that it has no duty to HM nor did it assume one when it allowed the ditch to be used for disposal of surface water.

In order to bring a claim for negligence, a plaintiff must first establish that a legal duty exists. Christensen v. Royal School Dist. No. 160, 156 Wn.2d 62, 124 P.3d 283 (2005). HM argues that BNSF's duty arises under the RESTATEMENT (SECOND) OF TORTS § 365 (1965), where a possessor of land is liable for physical harm caused by the disrepair of a structure or other artificial condition if the exercise of reasonable care would have made it safe or disclosed the disrepair. BNSF argues that Washington courts have not adopted the Restatement and have declined to impose liability for dangerous disrepair.[8]

---

[8] Because we affirm the trial court on this ground, we do not reach the issue of whether HM's claims were also properly dismissed because they were filed outside the statute of limitations.

HM cites Phillips v. King County, 136 Wn.2d 946, 968 P.2d 871 (1998) and Rothweiler v. Clark County, 108 Wn. App. 91, 29 P.3d 758 (2001), as supporting the imposition of a duty to maintain a drainage system. But neither case advances HM's position; both address the responsibility of municipalities to maintain public drainage systems, not obligations of private landowners.

HM argues that the distinction makes no difference, quoting Phillips, 136 Wn.2d at 958, "'[g]enerally, municipal rights and liabilities as to surface waters are the same as those of private landowners within the city.'" Br. of HM at 47. This is not correct. The statement from Phillips pertains to the liability for trespass caused by surface water, not a duty to maintain public drainage systems. The Phillips court explained that "many municipalities in Washington accept private storm water facilities for maintenance or ownership after they are constructed in connection with a new development. This occurs because homeowner associations or other private owners do not have the funds or motivation to do necessary maintenance to keep the drainage facilities operating at their maximum efficiency." Id. HM cannot establish that a private landowner has the same duty as a municipality to maintain the stormwater drainage facility that serves its property. We find that the trial court did not err when it found that BNSF had no duty.

The Letter from BBNA's Counsel

HM argues that the trial court erroneously excluded a letter from BBNA's counsel that indicated that it would no longer make payments on its lease and notified HM of its potential claims related to flooding. HM argues that the letter falls

within the business records exception listed in RCW 5.45.020. The trial court was not persuaded that it was a business record.

We use the de novo standard of review when reviewing all trial court rulings made in conjunction with a summary judgment motion. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Washington's Uniform Business Records as Evidence Act "makes evidence that would otherwise be hearsay competent evidence." Cantrill v. Amer. Mail Line, 42 Wn.2d 590, 608, 257 P.2d 179 (1953). Under the statute, a record of a relevant act, condition, or event,

> shall ... be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. RCW 5.45.020.

WRJV argues that the letter was properly excluded as hearsay and does not fall within the exception for business records. We agree. There is no statement from a records custodian or other qualified witness about its identity or that it had been made in the usual course of business at or near the time of the act in question. Neither the attorney's affidavit, nor the date of the letter, supply the missing pieces or provide the inherent reliability necessary to satisfy the exception. The trial court properly excluded the evidence as hearsay.

Fees and Costs

BNSF asks for an award of costs on appeal; upon submission of a cost bill, we award BNSF its costs under RAP 14.2. Because WRJV is not the prevailing party its request for fees and costs, pursuant to RAP 18.1 and RAP 14.3 is denied.

21

Reversed in part and remanded for further proceedings consistent with this opinion.

WE CONCUR:

Spelman, J.

Appelwick, J.